889 F.2d 1110
 281 U.S.App.D.C. 277
 MICHIGAN CONSOLIDATED GAS CO., Petitioner,
v.
ECONOMIC REGULATORY ADMINISTRATION, DEPARTMENT OF ENERGY, Respondent,
National Steel Corporation, Southern California Gas Company,
Intervenors.
 No. 88-1791.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 10, 1989.
Decided Nov. 17, 1989.
 
 Jeffrey M. Petrash, Washington, D.C., for petitioner.
 Thomas H. Kemp, atty. for the Dept. of Energy, with whom Henry A. Gill and Marc Johnston, Washington, D.C., attys. for the Dept. of Energy, were on the brief, for respondent.
 William H. Penniman, Washington, D.C., with whom Douglas West and Hill Lewis were on the brief, for intervenor Nat. Steel Corp.
 David L. Huard and E.R. Island, Los Angeles, Cal., entered appearances, for intervenor Southern California Gas Co.
 Before WILLIAMS, D.H. GINSBURG and SENTELLE, Circuit Judges.
 Opinion for the Court filed by Circuit Judge D.H. GINSBURG.
 D.H. GINSBURG, Circuit Judge:
 
 
 1
 Michigan Consolidated Gas, the local distribution company (LDC) serving the Detroit area, petitions for review of an order of the Economic Regulatory Administration granting National Steel Corporation authority to import from Canada up to 25 Bcf of natural gas per year. 1 E.R.A. p 70,786 (CCH) (1988). National sought the blanket import authorization under Section 3 of the Natural Gas Act, 15 U.S.C. Sec. 717b, in connection with its plan to build under the Detroit River a pipeline that would connect its steel plant directly to Union Gas Ltd. in Canada, see National Steel Corp., 45 F.E.R.C. p 61,100 (1988) (approving construction of underwater pipeline), thus enabling it to obtain gas directly from various Canadian suppliers. MichCon, which had for many years supplied National's gas needs, originally by sales of gas and in recent years by delivering gas National purchased from others, unsuccessfully protested National's application before ERA. On review, National has intervened in support of ERA.
 
 
 2
 * Section 3 of the NGA conditions an importation of gas upon the Secretary of Energy's authorization, which is not to be withheld unless he determines that the proposed importation "will not be consistent with the public interest." 15 U.S.C. Sec. 717b. The Secretary of Energy has delegated his Sec. 3 authority to ERA, Delegation Order No. 0204-111, 49 Fed.Reg. 6,690 (1984), pursuant to a Policy Statement instructing ERA to give special weight, in making the public interest determination, to the competitiveness of the import, need for the natural gas, and security of supply. Id. at 6,687.
 
 
 3
 MichCon here contends that ERA failed to engage in reasoned decisionmaking under Sec. 3 of the NGA in concluding that the proposed import arrangement is consistent with the public interest. Specifically, MichCon claims that (1) the agency was required but failed to consider whether National's direct importation, by making it possible for that end user to "bypass" MichCon's distribution facilities, shifts to the LDC's other customers that portion of its fixed costs that had previously been paid by National, and if so, whether that is not contrary to the public interest; (2) ERA should have considered the possibility that the wellhead price of the natural gas to be purchased in Canada might not be "competitive," and that it erred as a matter of law in attending exclusively to the competitiveness of the burnertip (i.e., delivered) price of the imported gas; and (3) ERA violated Sec. 3 of the NGA by authorizing National to import more gas than it needed. Finally, MichCon (4) challenges ERA's order denying its request for a hearing at which to raise certain allegedly material issues of fact, including the effect of the bypass arrangement on MichCon's other customers.
 
 
 4
 Our recent decision in Michigan Consolidated Gas Company v. Federal Energy Regulatory Commission, 883 F.2d 117 (D.C.Cir.1989), in which we upheld FERC's order authorizing Panhandle Eastern Pipe Line Company to bypass MichCon's distribution facilities by providing service directly to National's plant, makes it unnecessary for us to reach the merits of MichCon's present arguments. National reports that since its recent connection to the Panhandle pipeline, it has discontinued taking any gas from MichCon; indeed, MichCon has physically disconnected National from its distribution system. National now buys gas in the open market and has it transported to its plant by Panhandle at a lower price than it would otherwise have to pay MichCon for such transportation. Unless the Supreme Court reverses our prior decision, therefore, MichCon has no realistic prospect of regaining National as a customer. In light of this development, we must conclude that National's making provision to supply its needs through its own pipeline connecting it to Canadian sources, as an alternative to depending solely upon Panhandle, represents no cognizable injury to MichCon, and no injury at all that can be redressed by this court. We therefore find that MichCon lacks standing to seek review of ERA's order.
 
 II
 
 5
 Pursuant to Sec. 19(b) of the NGA, only a party that is "aggrieved" by an order issued under that Act may obtain judicial review thereof. 15 U.S.C. Sec. 717r(b). In general, a competitor that stands to lose business because of a proposed import arrangement has standing to challenge ERA's approval of that arrangement. See Panhandle Producers v. ERA, 822 F.2d 1105 (D.C.Cir.1987) and New England Fuel Institute v. ERA, 875 F.2d 882 (D.C.Cir.1989). The interests of such a competitor-protestant are generally "congruent with a statutory purpose to restrict entry" to some degree and thus "at least 'arguably' within the zone of interests sought to be protected by section 3 of the NGA." 822 F.2d at 1109. MichCon understandably, therefore, seeks to position itself as a competitor for National's load; it has no other hope of establishing its right to review.
 
 
 6
 In our view, however, MichCon asserts no injury that is fairly traceable to, or redressable by our reversal of, the ERA order it would challenge. That order was issued on July 11, 1988. FERC's order authorizing Panhandle to provide direct service to National was issued on June 4, 1987. Since ERA's decision approving the proposed import arrangement was issued only after FERC had approved, and the parties had implemented, the Panhandle connection, MichCon cannot convincingly argue that the ERA order authorizing the Canadian import arrangement made it any more difficult for MichCon to compete for National's business. National's decision to switch from MichCon's to Panhandle's distribution facilities, and FERC's 1987 order approving that decision, meant that MichCon had already failed in its attempt to compete for National's load. ERA's 1988 order approving another competitive alternative for National, the proposed import arrangement, did not deprive MichCon of a customer whose load it would otherwise have had a realistic opportunity of obtaining.
 
 
 7
 Nonetheless, MichCon maintains that "it remains interested in providing service" to National, and claims that National "would have to turn to MichCon for service" in the event of "interruption or force majeure events in the Panhandle system or upstream of Panhandle." R.Br. at 5. A disruption upstream of Panhandle would, however, merely remit National to replacing one supplier with another in the spot market. As for a disruption of Panhandle's ability to deliver, we have no basis, apart from MichCon's bare assertion that "such an event is not a remote possibility," upon which to conclude that it is a sufficiently realistic possibility to give MichCon standing under Sec. 19(b) of the NGA. Thus, MichCon's claim of "injury" comes to this: it is better to stand-by hoping for National's business in a duopoly market (with Panhandle) than in a triopoly market (with Panhandle and the pipeline to Canada). They also serve who only stand and wait; but we cannot see that MichCon had enough prospect of being called for the loss of that possibility to confer standing. The mere chance that a force majeure will disable Panhandle but leave MichCon intact and able to provide service to National does not amount to a realistic prospect that National would be restored to MichCon as a customer as a result of our favorable disposition on the merits of this case.
 
 III
 
 8
 We pause to consider MichCon's argument that it is something of a "shell game" to deny it standing here for want of injury--it does not address the problem of redress--inasmuch as FERC approved National's connection to Panhandle "to a significant degree" on the premise that "MichCon would not be injured ... because National would be obtaining its energy needs in any event from other sources." R.Br. at 5. Now that the Panhandle bypass has enabled National to terminate its longstanding supply relationship with MichCon, it is circular, we are urged, to maintain that MichCon is not injured by National's importation of Canadian gas through its pipeline under the Detroit River. In essence, MichCon claims that it is injured both by the Panhandle bypass and by the importation of gas, and that it is artificial and unfair separately to examine each of these sources of injury and thus to deny the victim standing to challenge either of them on the ground that the harm would arise in any event from the other source.
 
 
 9
 MichCon's argument has an intuitive appeal, and it raises an interesting question as to whether each of two concurrent and independent events can be said to "cause" a harm directly enough to give the injured party standing to complain against one of them in isolation from the other. Cf. Summers v. Tice, 33 Cal.2d 80, 199 P.2d 1 (1948). As it turns out, however, we do not have to address that metaphysical difficulty today. The mundane fact is that in the FERC proceeding in which the Panhandle bypass was at issue, the Commission did not rest only upon the proposition that "[t]he potential detriments to MichCon and its customers will occur regardless of whether the application ... is granted because National Steel has a viable other supply option, the underwater pipeline, which it will be able to use in the near future...." The ALJ found that as a fact, Panhandle Eastern Pipe Line Co., 38 F.E.R.C. p 63,009 at 65,076, but the Commission relied upon that fact only in passing; its principal point was that "the public interest is best served by ... competition" between LDCs and pipelines to serve industrial customers, to which it added only that it saw in this case "no reason to deviate from [that] belief ... especially in light of" the ALJ's finding. 40 F.E.R.C. p 61,220 at 71,752. Indeed, this would have been an odd case for FERC to depart from its preference for competition, inasmuch as MichCon had conceded "that the loss of National Steel alone would not cause it to file for a rate increase." 38 F.E.R.C. at 65,043.
 
 
 10
 MichCon claims that it has in fact since sought and received a rate increase based at least in part upon the loss of National's custom, and that "MichCon's other customers are now paying millions of dollars per year that National previously paid." R.Br. at 6. If so, then MichCon's concession in the Panhandle proceeding may not have been prescient. Be that as it may, however, it is not in a position now to contend that it did not then have an opportunity to complain of the effect that National's bypassing its service would have upon other rate payers. Litigation may too often seem a game of chance, particularly to the loser, but let us not, upon losing, be too quick to complain that the game is rigged.
 
 IV
 
 11
 In sum, MichCon lacks standing under Sec. 19(b) of the NGA to seek review of the ERA decision authorizing National to import gas from Canada. Accordingly, its petition for review is
 
 
 12
 Dismissed.