The AMERICAN AGRICULTURE MOVEMENT, INC., et al., Plaintiffs,

v.

The BOARD OF TRADE OF The CITY OF CHICAGO, et al., Defendants.

No. 89 C 8467.

United States District Court, N.D. Illinois, E.D.

April 12, 1994.

Terrance G. Reed, Lauren Clingan, Asbill, Junkin & Myers, Chtd., Washington, DC, for plaintiffs.

John E. Angle, Garrett B. Johnson, Robert S. Steigerwald, Jr., Sara Rollins Slaughter, Kirkland & Ellis, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

MAROVICH, District Judge.

Plaintiff American Agriculture Movement, Inc. ("AAM"), a national organization representing and advocating the interests of farmers, along with several of its soybean-farmer members, brought this suit against the Chicago Board of Trade and 26 of ·its officers and employees (collectively "CBOT") under the Commodity Exchange Act ("CEA"), the Sherman Antitrust Act, and state common law. The Seventh Circuit affirmed this Court's dismissal of the CEA count and the state common law claims, but reversed this Court's entry of summary judgment on the antitrust claim. *American Agriculture Movement, Inc. v. Board of Trade,* · 977 F.2d 1147 (7th Cir.1992). Now before the Court is Defendants' motion to dismiss the single remaining antitrust count pursuant to Fed. R.Civ.P. 12(b)(1) and 12(b)(6). Defendants contend that Plaintiffs lack both Article III standing and standing to raise an antitrust claim. In addition, Defendants argue that AAM lacks associational standing to raise the claims of its members. For the· reasons set forth below, the Court will grant Defendants' motion to dismiss.

## BACKGROUND

This Court has written two prior opinions in this case and the Seventh Circuit also has reviewed the factual allegations presented by the Plaintiffs. Under these circumstances, we will endeavor tò contain this statement of facts to those necessary to provide context to the resolution of the pending motions. According to the Complaint, Plaintiffs claim to have suffered injuries due to a price decline in the cash market for soybeans allegedly linked to action taken by the CBOT on July 11, 1989, regarding the futures market in soybeans. The Emergency Resolution ("Resolution") adopted by the CBOT specified that:

> Effective as of the opening of the market on July 12, 1989, any person or entity, either alone or in conjunction with any other person or entity, who owns or controls a gross long or gross short position[1] for any purpose whatsoever in excess of three million bushels in the July 1989 soybean futures contract traded on the Exchange must reduce said position and subsequent positions by at least 20% per trading day subject to the following absolute limits. .
>
> No person or entity, either alone or in conjunction with any other person or entity, shall own or control a gross long or gross short position for any purpose whatsoever in the July 1989 soybean futures contract traded on the Exchange in excess of three million bushels as of the close of trading on Tuesday, July 18, 1989.
>
> No person or entity, either alone or in conjunction with any other person or entity, shall own or control a gross long or gross short position for any purpose whatsoever in the July 1989 ̇soybean futures contract traded on the Exchange in excess of one million bushels as of the close of trading on Thursday, July 20, 1989.
>
> This resolution is applicable to all positions, whether hedge or speculative.

AAM alleges that the publication of the Resolution led to a price decline in the soybean futures market. The AAM further asserts that the Resolution caused a propor-

---

1. For the benefit of readers unfamiliar with futures contracts, we note that. according to CBOT regulations, each soybean futures contract applies to a fixed quantity of 5,000 bushels of soybeans. In overly simplified terms, a long position in soybean futures is a position to buy soybeans for delivery at a designated future time at the agreed upon price. On the other hand, a short position in soybean futures is a position to sell soybeans at the agreed upon price for delivery at a designated future time. For example, a long position in 4,000 contracts reflects a position to buy 20 million bushels of soybeans. Because of the ability to offset positions, actual delivery is a rare event. For a more comprehen-sive discussion of the various components of commodities markets and futures contracts, see Philip M. Johnson & Thomas L. Hazen, I *Commodities Regulation* §§ 1.00–1.19, at 1–84 (2d ed. 1989); *see also Chicago Mercantile Exch. v. SEC,* 883 F.2d 537, 542–43 (7th Cir.1989) (discussing futures contract trading), *cert. denied,* 496 U.S. 936, 110 S.Ct. 3214, 110 L.Ed.2d 662 (1990); *Leist v. Simplot,* 638 F.2d 283, 286–88 (2d Cir. 1980) (same), *aff'd sub nom., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982); William F. Sharpe & Gordon J. Alexander, *Investments,* ch. 5, at 594–628 (4th ed. 1990) (same).

tionate decline in soybean cash market prices. AAM accuses the CBOT, individual defendants, affiliated firms and their clients, of a conspiracy to adopt the Resolution to manipulate the prices in the soybean market to the benefit of the speculative gross short positions in the soybean market held by these individuals and firms. AAM contends that soybean cash market prices were relatively high prior to the Resolution and would have remained so or even risen but for the issuance of the Resolution. AAM alleges that the CBOT, Directors, and the Business Conduct Committee members conspired with each other and with associated trading firms and their clients to restrain trade in the soybean futures and cash markets. As a result, AAM claims that its soybean farmer members who sell or refrained from selling in the soybean cash market suffered great financial loss.

## DISCUSSION

As a preliminary matter, the Court must define the permissible scope of our inquiry in deciding a motion under Fed.R.Civ.P. 12(b)(1), as opposed to Fed.R.Civ.P. 12(b)(6). Plaintiffs argue that the Court is limited to the factual allegations of the complaint and cannot go beyond them. Plaintiffs, however, appear to ignore the fact that Defendants' motion is brought under both Rule 12(b)(1) for lack of Article III standing and Rule 12(b)(6) for failure to state an antitrust claim.[2] Defendants, not surprisingly, have a different view of what the Court may consider and argue that we are not limited to the allegations of the complaint on a motion to dismiss under Fed.R.Civ.P. 12(b)(1).

It is true that one may find language indicating that on a motion to dismiss the Court must accept the well-pleaded factual allegations of the complaint as true and interpret all reasonable inferences in favor of the plaintiff. *See, e.g., Capitol Leasing Co. v. F.D.I.C.,* 999 F.2d 188, 191 (7th Cir.1993). Such statements, however, do not offer a complete understanding of Plaintiffs' burden when faced with a motion, such as the one here, that attacks the factual basis for jurisdiction under Fed.R.Civ.P. 12(b)(1). Under these circumstances, it is well-settled that once Defendants question jurisdiction, the Plaintiffs cannot rest on their pleadings.[3] As the Seventh Circuit noted in *Capitol Leasing,* "[t]he district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Id.* (quoting *Grafon Corp. v. Hausermann,* 602 F.2d 781, 783 (7th Cir.1979)); *see also McNutt, v. General Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936); *Rennie v. Garrett,* 896 F.2d 1057, 1057–58 (7th Cir.1990). We also note, however, that "[i]f a defendant's Rule 12(b)(1) motion is an indirect attack on the merits of the plaintiff's claim, the court may treat the motion as if it were a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted." *Peck-mann v. Thompson,* 966 F.2d 295, 297 (7th Cir.1992); *see also Malak v. Associated Physicians, Inc.,* 784 F.2d 277, 279 (7th Cir. 1986). With these standards in mind, we will address the Defendants' multi-faceted attack on Plaintiffs' claim.

---

**2.** Plaintiffs are correct to the extent that had Defendants brought only a motion to dismiss under Fed.R.Civ.P. 12(b)(6), "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2137, 119 L.Ed.2d 351 (1992) (quoting *Lujan v. National Wildlife Federation,* 497 U.S. 871, 889, 110 S.Ct. 3177, 3189, 111 L.Ed.2d 695 (1990)).

**3.** Defendants correctly note the ample authorities in support of this proposition. *See, e.g., NAACP v. American Family Mut. Ins. Co.,* 978 F.2d 287,

293 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2335, 124 L.Ed.2d 247 (1993); *Schaefer v. Transportation Media, Inc.,* 859 F.2d 1251, 1253–54 (7th Cir.1988); *Kontos v. United States Dept. of Labor,* 826 F.2d 573, 576 (7th Cir.1987) ("when the party moving for dismissal under Rule 12(b)(1) challenges the factual basis for jurisdiction, the nonmoving party (i.e., the plaintiff) must submit affidavits and other relevant evidence to resolve the factual dispute regarding the court's jurisdiction"); *Sprague v. King,* 825 F.Supp. 1324, 1329 (N.D.Ill.1993) ("Once questioned, it is plaintiff's burden to establish that all jurisdictional requirements have been satisfied.").

## Article III Standing

Plaintiffs claim two forms of injury allegedly caused by Defendants' conduct in issuing the Resolution of July 11, 1989. First, Plaintiffs claim to represent persons who sold cash market soybeans after July 12, 1989, at a price that was artificially depressed. Second, Plaintiffs claim to represent persons who refrained from selling cash market soybeans after July 12, 1989, because they believed the price was too low. Plaintiffs never traded July 1989 soybean futures contracts. Defendants challenge the ability of both groups of Plaintiffs to meet the standing requirements of Article III.

Article III standing requires that a party seeking to proceed in federal court meet three requirements. The Seventh Circuit has summarized these requirements as follows:

> (1) the party must personally have suffered an actual or threatened injury caused by the defendant's allegedly illegal conduct, (2) the injury must be fairly traceable to the defendant's conduct, and (3) the injury must be one that is likely to be redressed through a favorable decision.

*Simmons v. ICC,* 900 F.2d 1023, 1026 (7th Cir.1990) (quoting *City of Evanston v. Regional Transportation Authority,* 825 F.2d 1121, 1123 (7th Cir.1987), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 697, 98 L.Ed.2d 649 (1988)). Defendants' argument requires us to focus primarily on the second element.

■ Defendants suggest that an order issued by the Commodities Futures Trading Commission ("CFTC") on the morning of July 11, 1989, prior to the CBOT action, would have caused any alleged decline in prices whether or not the CBOT action was taken later that day. As a result, Defendants contend this independent, supervising action prevents Plaintiffs from establishing the necessary link between Defendants' conduct and their resulting injury.

Defendants assert that on July 11, 1989, the CFTC determined that "a threat to an orderly liquidation of the July ... 1989 soybean futures" contract existed. *Oversight Hearing With Regard to the Reauthorization of the Commodity Futures Trading Commission: Hearing Before the Senate Committee on Agriculture, Nutrition and Forestry,* 101st Cong., 1st Sess. 216–17 (1989) (testimony of Kalo A. Hineman, Commissioner, CFTC) (hereinafter *"Hearing"*). That determination was made in a letter faxed on July 11 to Central Soya, a member of the Ferruzzi Finanziara, S.p.A ("Ferruzzi") group. *Id.* The CFTC, along with the CBOT, had monitored Ferruzzi's activities in the May and July 1989 soybean futures market. In the letter the Commission also revoked the hedge exemption of Central Soya for anticipatory processing requirements during the last three trading days[4] in July and August futures. *Id.* According to Defendants, the CFTC's action required Ferruzzi group to reduce its holdings from approximately 4,095 contracts, a position encompassing almost 60 percent of the outstanding long or buy futures contracts, to 600 contracts by July 18, 1989. *See AAM,* 977 F.2d at 1151. After being advised of the CFTC action,[5] the CBOT issued its Resolution which set more specific requirements for liquidation of gross long and short positions held by any trader.

As a result of the CFTC action that purportedly preceded the issuance of the CBOT Resolution, Defendants maintain that Plaintiffs cannot show that their injury "fairly can be traced to the challenged action of the defendant, [rather than] injury that results from the independent action of some third party [i.e. the CFTC] not before the court." *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1926,

---

4. The last day of trading for July 1989 futures was July 20, 1989.

5. Defendants do not cite to any material that details when or how this communication between the CFTC and the CBOT occurred. Our review of the *Hearing* indicates that the CFTC and CBOT were in frequent contact throughout this period. We also note that a "Chronology of Events" prepared by CFTC staff indicates that the Business Conduct Committee had already recommended taking emergency action prior to the CFTC's decision to revoke the Ferruzzi hedge exemption. Finally, the Court finds that the present record as a whole provides only a cursory view into the circumstances and timing of the CFTC action.

48 L.Ed.2d 450 (1976). Defendants contend that the CFTC letter to Central Soya revoking its regulatory exemption would have caused any decline in prices whether the CBOT issued its Resolution or not.

Plaintiffs point out that the CFTC order was a private order directed only at Central Soya, a Ferruzzi affiliate. Ferruzzi apparently was the largest single holder of long contracts. Defendants do not explain the link between Central Soya and Ferruzzi or how a letter directed at Central Soya bound all members of the Ferruzzi group. In contrast to the CFTC letter, the CBOT Resolution, a publicly announced order, applied to all holders of both gross long and short contracts.

Our review of the cases cited by Defendants [6] results in the conclusion that on the current record, the Court is unable to find that the CFTC order is the type of independent superseding event that breaks the causal chain for purposes of Article III standing. For example, in *Simmons v. ICC*, 900 F.2d 1023, 1026 (7th Cir.1990), the Seventh Circuit found that petitioners who sought to overturn a decision by the ICC to allow a railroad to abandon a rail line lacked standing because any competitive injury could not be traced to the ICC's actions. A train derailment had rendered the rail line inoperable for at least a year and one-half prior to institution of proceedings before the ICC. The Court reasoned that even if the ICC denied the request to abandon the line, no evidence nor any allegation indicated that the railroad would repair the line to make it operable. *Id.* Under these circumstances, the alleged injury to petitioners due to their inability to ship on the line could not be traced to the ICC's actions in permitting the railroad to abandon the line. *Id.* After ruling out other asserted bases for standing, the court dismissed the action for lack of standing.

In a somewhat different context, the Supreme Court in *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), found that black parents who challenged an IRS tax-exemption granted to private schools, including those that purportedly discriminated against children on the basis of race, lacked standing to pursue their claim. In finding that the parents lacked standing, the Court identified numerous speculations and intervening decisions that interrupted the causal link between the IRS action and plaintiffs' alleged injury. *Id.* at 758, 104 S.Ct. at 3328. First, the Court noted that it was entirely speculative whether there were enough racially discriminatory schools in the community for withdrawal of exemptions to have an appreciable effect. Second, the Court found plaintiffs' claims involved further speculation as to whether removal of tax exemptions would lead any school to change its policies and as to whether any parent would transfer their child to public school if the private school lost its tax exemption. Finally, the Court deemed it purely conjectural that enough parents and school officials would reach decisions that would have a significant impact on the racial composition of the public schools. *Id.* As a result, the plaintiffs lacked standing because their injury could not be fairly traced to the IRS action.

Under the reasoning of these cases, it becomes clear that where plaintiffs' injuries would have occurred whether defendants acted or not, Article III standing is lacking because their injuries cannot then be fairly traceable to the defendants' conduct. On the basis of the current record, we cannot say that the CFTC action was independent of the CBOT action given the obvious level of interaction and communication between both entities and the lack of a complete record to review the circumstances surrounding the CFTC action. Moreover, we could only speculate that the CFTC action directed at Central Soya and not released to the public would have caused the same alleged market effect that the similar, but not identical, CBOT Resolution allegedly caused in the fu-

---

**6.** We do not find *Michigan Consol. Gas v. Energy Regulatory Admin.*, 889 F.2d 1110, 1111–12 (D.C.Cir.1989), on point. Though the court finds that a plaintiff challenging an administrative agency's action lacks standing to obtain judicial review and refers to the lack of an injury fairly traceable to the agency's action, it does so in the context of standing under § 19(b) of the National Gas Act, 15 U.S.C. § 717r(b). *Id.*

tures and cash markets after its public announcement.

■ Alternately, Defendants claim that the CBOT Resolution cannot be traced to prices in the futures market, let alone the cash market, because the Resolution did not set prices. Instead, it allowed the market participants, both longs and shorts, to freely negotiate prices. Defendants argue that, like the voters challenging the patronage system in *Rutan v. Republican Party of Illinois*, 868 F.2d 943, 957 (7th Cir.1989), countless individual decisions of futures market participants set the price for July 1989 futures and these individual decisions render the line of causation from the CBOT Resolution to Plaintiffs' injuries too tenuous. Defendants further maintain that even more imponderables intervene between a decline in price in the futures market and prices on the cash market.[7]

When confronted with these arguments, AAM essentially relies on its allegations and points to the CBOT Resolution as the device through which it alleges Defendants restrained trade which caused a price decline in the futures market and a corresponding decline in the cash market to the detriment of Plaintiff farmers. Plaintiffs could have done more to aid the Court. Be that as it may, the Court finds that Defendants' argument sweeps too broadly in comparing this case to *Rutan.*

■ In *Rutan*, voters challenged the patronage hiring system on the ground that it gave incumbents an inordinate advantage over their opponents and thus deprived the voters of equal access and effectiveness of elections. 868 F.2d at 957. The Seventh Circuit affirmed the district court's decision finding that the voters lacked standing. First, the Seventh Circuit explained the incumbents' advantage, if any, comes not from the hiring policy, but from the independent evaluation of potential workers that the incumbent will indeed win. *Id.* at 958 (quoting *Shakman v. Dunne*, 829 F.2d 1387, 1397 (7th Cir.1987), *cert. denied*, 484 U.S. 1065, 108

S.Ct. 1026, 98 L.Ed.2d 991 (1988)). The evaluation of voting decisions of these potential workers would require a review of countless individual assessments of political activity such that the plaintiff voters injury could not be fairly traced to the defendant. *Id.* Based on *Rutan*, we find that for purposes of Article III, standing may be lacking where the causal connection between defendants' conduct and plaintiffs' claims depends on a speculative review of unknown or unknowable decisions of third parties not before the court.

As the Seventh Circuit noted in this case, the "Resolution no doubt restrained trade in the July 1989 soybean futures market," 977 F.2d at 1157, because it affirmatively mandated certain traders to liquidate their positions by certain increments during the specified time frames. In this sense, the soybean futures market was not a free and competitive one; instead, it operated under the influence of the Resolution. Unlike the case in *Rutan* where the challenged policy provided no advantage unless others formed particular beliefs that the incumbent would win, the CBOT Resolution set in motion a liquidation of contracts. While the Resolution set no prices on its face, it certainly altered the futures trading landscape and the Defendants cannot shield the Resolution behind the numerous decisions of individual traders who acted within the affected market.

In addition, Plaintiffs' allegations indicate that Defendants' price neutral action, actually was calculated to cause a decline in both futures and cash prices. Defendants have pointed to matters outside the Complaint in their favor, but we also note that some of those matters weigh against them. For example, as Commissioner Hineman's testimony at the *Hearing* demonstrates, the clear concern of the CFTC and CBOT was Ferruzzi group's attempted execution of a "squeeze" by accumulating a dominant long position in both the soybean futures and cash markets. *Hearing*, at 185–86. Though price neutral on its face, this Court cannot say that Defen-

---

7. Defendants list of imponderables includes the weather, availability of competing soybeans from other regions and other nations, transport costs to ship grains, purchasing needs of any particu-

lar buyer, the quality and grade of the soybeans, storage costs incurred by farmers holding soybeans for later sale, and prices set by processors.

dants could not anticipate a potential soybean futures price decline as a result of Ferruzzi's substantial liquidation of its long position in the July 1989 soybean futures. Moreover, Commissioner Hineman's testimony includes the tentative acknowledgment that "a portion of the price declines in the July soybean future and in cash prices on July 12 may be an unfortunate side-effect of the emergency action." *Id.* at 194. To be fair, we also note that Commissioner Hineman added that "the more significant price slide in soybeans that began earlier in July before the emergency action and extended into early August, cannot be attributed to that event." *Id.* We only mention these statements to show that the nature and impact of the CBOT Resolution is not as divorced from the CFTC's action or, more importantly, the soybean futures and cash markets as Defendants would have one believe.

With that said in regard to the Resolution's potential effect on the soybean futures market, we find the Defendants' argument regarding the various imponderables involved in assessing the impact of a futures market price decline on the cash market more appealing yet still unsuccessful. On one hand, commentators acknowledge that "[w]hen the futures market experiences a significant price change, the prices of that commodity in the cash market will usually experience a similar movement." Johnson & Hazen, I *Commodities Regulation, supra,* § 1.04, at 13. Johnson and Hazen, however, also recognize the tremendous number of variables and difficulties involved in determining the cash price for a commodity. Johnson & Hazen, III *Commodities Regulation, supra,* §§ 5.13–5.18, 5.33, at 32–39, 66–67. To resolve this conflict, we turn to one of the acknowledged functions of the futures market.

One of the main economic functions of futures markets is "the provision of reliable pricing information." *Cargill, Inc. v. Hardin,* 452 F.2d 1154, 1172–73 (8th Cir.1971), *cert. denied sub nom., Cargill, Inc. v. Butz,* 406 U.S. 932, 92 S.Ct. 1770, 32 L.Ed.2d 135 (1972). Consistent with this function, the CEA requires the CBOT to enact and enforce rules to prevent price manipulation, cornering and other market disturbances that might lead to distortion in prices. 7 U.S.C. § 7(d); 17 C.F.R. § 1.51(a). In light of this prominent function and the traditional parallels between futures and cash prices, we conclude that there is a link, albeit difficult to measure, between the futures and cash markets. As a result of this link, we find that the various imponderables argued by Defendants do not break the causal chain for purposes of Article III standing for those Plaintiffs who actually sold soybeans during the alleged period of price decline in the cash market.

On the other hand, we cannot conclude that Article III is elastic enough to reach those Plaintiffs who refrained from selling soybeans allegedly because they felt the prices for soybeans were too low. The complexities, ambiguities and potential for pure speculation that exist in tracing a price decline from the futures market to the cash market are enlarged beyond the scope of Article III when one adds the further conjecture that any particular Plaintiff decided not to sell soybeans because he believed the price was too low. *Cf. Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (individuals who refrained from purchasing or selling stock lacked standing to bring securities fraud action based on claim that a misleading prospectus caused them not to sell or purchase). Farmers may decide not to sell soybeans at any given time for a host of articulable and inarticulable reasons such as a belief that prices will climb, excessive transportation costs, low storage costs, the poor quality or quantity of available supply, or a continuing relationship with a particular buyer who promises to buy in the future. Given that cash markets are essentially local, these considerations would vary from region to region and farmer to farmer. The causal chain from Defendants' action to the futures market to the cash market to those who refrained from selling soybeans during the asserted period of low prices is simply too weak to support standing for those Plaintiffs who refrained from selling soybeans.

*Standing Under the Clayton Act* [8]

■ Section 4 of the Clayton Act, 15 U.S.C. § 15(a), provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained...." Despite the breadth of this language, the Supreme Court has emphasized that " 'Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.' " *Associated General Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 534, 103 S.Ct. 897, 906, 74 L.Ed.2d 723 (1983) (quoting *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 263 n. 14, 92 S.Ct. 885, 892 n. 14, 31 L.Ed.2d 184 (1972)); *see also Illinois Brick Co. v. Illinois*, 431 U.S. 720, 761, 97 S.Ct. 2061, 2082, 52 L.Ed.2d 707 (1977); *Nelson v. Monroe Regional Medical Center*, 925 F.2d 1555, 1562 (7th Cir.1991); *Southwest Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Assoc.*, 830 F.2d 1374, 1377 (7th Cir.1987). As the Supreme Court has observed, the "focus of the doctrine of 'antitrust standing' is somewhat different from that of standing as a constitutional doctrine. Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make the further determination whether the plaintiff is a proper party to bring a private antitrust action." *Associated General Contractors*, 459 U.S. at 535 n. 31, 103 S.Ct. at 907 n. 31. This Court now proceeds to determine whether Plaintiffs are proper parties to bring this antitrust action.

After expressing dissatisfaction with various tests, the Supreme Court set forth several factors to guide our present inquiry in *Associated General Contractors*, 459 U.S. at 537–45, 103 S.Ct. at 908–12. Courts have developed various formulations of the factors outlined by the Supreme Court. We find the approach set forth by the Sixth and Eighth Circuits particularly useful. In *Lovett v. General Motors Corp.*, 975 F.2d 518 (8th Cir.1992), the Eighth Circuit listed the factors as follows:

> (1) the causal connection between the alleged antitrust violation and the harm to the plaintiff; (2) improper motive; (3) whether the injury was of the type that Congress sought to redress with the antitrust laws; (4) the directness between the injury and the market restraint; (5) the speculative nature of the damages; and (6) the risk of duplicate recoveries or complex damage apportionment.

*Id.* at 520; *see also Peck v. General Motors Corp.*, 894 F.2d 844, 846 (6th Cir.1990).

Though no black-letter rules or tests exist, the Seventh Circuit has distilled the factors into three primary concerns. *Nelson*, 925 F.2d at 1562–63. The first of the factors is the causal connection between the damages claimed by the antitrust plaintiff and the harm to the plaintiff. *Id.* at 1562. The second factor is the "nature of the injury suffered by the plaintiff and the relationship between that injury and the type of conduct sought to be redressed by the provision of a private remedy for antitrust violations." *Id.* at 1563. Finally, the third factor is "the directness of the asserted injury and, closely related, the risk of duplicative recoveries or (conversely) the difficulty of apportioning damages among various classes of plaintiffs." *Nelson*, 925 F.2d at 1563. Of particular relevance to this case, we add the related consideration of the "existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement." *Associated General Contractors*, 459 U.S. at 542, 103 S.Ct. at 911. As the Court explained, the existence of such a class of persons "diminishes the justification for allowing a more remote party ... to perform the office of private attorney general." *Id.*

8. In contrast to the issue of Article III standing which was not mentioned, the Seventh Circuit noted that on remand this Court might "find it profitable to examine whether the AAM, whose members participated in the cash market, has standing under § 4 of the Clayton Act, 15 U.S.C. § 15, to bring an antitrust suit challenging anticompetitive practices in the futures market." 977 F.2d at 1167. That issue is now squarely joined before this Court. Unlike our discussion of Article III standing, our resolution of this issue will depend on the allegations of the Complaint and we will not consider matters outside of those allegations.

The differences between the expressions of the *Associated General Contractors* factors are ones of form rather than substance, and thus we are not concerned with any particular list. As the Seventh Circuit observed, "[u]ltimately, standing involves a case-by-case analysis of 'the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them.'" *Greater Rockford Energy & Technology Corp. v. Shell Oil Co.*, 998 F.2d 391, 396 (7th Cir.1993) (quoting *Associated General Contractors*, 459 U.S. at 535, 103 S.Ct. at 907). Though various paths exist to reach a conclusion as to whether Plaintiffs are proper parties to bring this antitrust action, we will focus our attention on those trails marked by the parties' arguments.

Defendants initially concentrate their attack on Plaintiffs' claim on the directness or, more precisely, the indirectness of the relationship between the Resolution and the alleged decline in soybean cash market prices. Defendants argue that Plaintiffs, who participated only in the cash market, have suffered only indirect injuries from the Resolution which was expressly directed at the futures market in July 1989. Plaintiffs respond that the relevant market is the market for soybeans and the decline in cash market prices was both foreseeable and inextricably intertwined with the objectives of the alleged conspiracy.

As a threshold matter, we dispense with the notion proffered by Plaintiffs that the relevant market is the "market for soybeans." The Plaintiffs' Complaint clearly notes the distinction between the futures and cash markets for soybeans. As we noted above, the futures market operates in a distinctive manner with one essential variable term—price. As a fair reading of the Complaint indicates, several cash markets operate throughout the country. Those markets operate without the structure imposed by necessity in the futures market. Despite Plaintiffs' assertion to the contrary, Defendants wisely do not contend that the markets are entirely unrelated. In this Court's view, the futures and cash markets for soybeans are distinct though obviously related markets. *Cf. Utesch v. Dittmer*, 947 F.2d 321, 323 (8th Cir.1991) (recognizing that "[t]here are two distinct markets in which cattle transactions take place: The 'cash' market and the 'futures' market."), *cert. denied,* — U.S. —, 112 S.Ct. 1764, 118 L.Ed.2d 425 (1992).

Moreover, the Seventh Circuit implicitly recognized this difference when it framed the issue for potential consideration on remand regarding Plaintiffs' standing to raise an antitrust claim when they did not participate in the soybean futures market. *AAM*, 977 F.2d at 1167; *see supra* n. 8. We conclude that Plaintiffs' definition of the relevant market as the market for soybeans masks the important differences in function and methods between the futures and cash markets, not the least of which is the fact that futures traders rarely are concerned with taking or making actual delivery of the commodity as a result of their ability to offset their futures contract obligations. As a result, we decline to consider the Plaintiffs' standing in relation to the alleged injuries they suffered as participants in a generic "market for soybeans."

Now we turn to the question of the directness of the injury allegedly sustained by Plaintiffs. Defendants rely on *Associated General Contractors, S.W. Suburban Realtors*, and a more recent Supreme Court case applying antitrust standing analysis to RICO claims, *Holmes v. Securities Investor Protection Corp.*, — U.S. —, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992), to show that Plaintiffs claims are so indirect as to warrant denying them standing under § 4. We begin our discussion with these three cases.

In *Associated General Contractors*, the Supreme Court considered the standing of labor unions who sought recovery under antitrust law for damages to their business activities. The unions alleged that the defendants, a multiemployer association of construction contractors and its members, restrained the market for subcontracting services by coercing landowners and other parties to divert business from union to nonunion contractors and subcontractors. The Court reasoned that the immediate victims of coercion, the contractors and subcontractors had experienced direct injury due to the alleged violation. 459 U.S. at 540–41, 103 S.Ct. at 909–10.

Conversely, the plaintiff unions had only experienced harm as an indirect result of whatever damages the construction contractors and subcontractors had suffered. *Id.* at 541 & n. 46, 103 S.Ct. at 910 n. 46. The Court explained that the causal chain between the alleged restraint in the market for construction subcontracts, a market in which the plaintiff unions did not participate, and the harm allegedly suffered by the union contained several "vaguely defined links." *Id.* at 540, 103 S.Ct. at 909. The speculative nature of the causal chain and the fact that the plaintiffs did not participate as consumers or competitors in the relevant market weighed against standing.

Additionally, the obvious existence of parties more directly harmed by the alleged violation diminished the need to allow more remotely injured parties to proceed with a damage action under § 4. *Id.* at 542, 103 S.Ct. at 911. Further, the Court found the plaintiffs' claim replete with speculation, complex questions of apportionment of damages, and the potential for duplicate recoveries. Taken together, these factors weighed heavily against enforcement of the plaintiffs' antitrust claim.

In *S.W. Suburban*, the Seventh Circuit applied the relevant factors to the claims of a corporate president who sought to pursue an independent antitrust claim for damages he suffered due to an alleged conspiracy to exclude his corporation from the market for the provision real estate brokerage services. The Seventh Circuit found that his claims were merely derivative of the damages suffered by his corporation. 830 F.2d at 1378. The court noted the substantial body of case law finding that derivative damages "sustained by employees, officers, stockholders, and creditors of an injured company do not constitute 'antitrust injury' sufficient to confer antitrust standing." *Id.* We fully agree with the general rule stated in *S.W. Suburban* but find it of only marginal value given the different factual setting presented by Plaintiffs' claim.

In *Holmes*, the Supreme Court applied the proximate cause analysis adopted in *Associated General Contractors* for Clayton Act claims to RICO claims brought under 18 U.S.C. § 1964(c). — U.S. at — — —, 112 S.Ct. at 1315–18. Defendants acknowledge the different statutory context of *Holmes* but offer it as another example of an indirect claim not warranting standing. The Securities Investors Protection Corporation ("SIPC"), a private non-profit corporation, is charged with various statutory duties including a duty to advance funds to pay the claims of customers of defunct brokers. In *Holmes*, the SIPC sought recovery against multiple defendants under RICO for an alleged stock manipulation scheme that prevented two broker-dealers from meeting obligations to their customers. The SIPC's statutory duty to reimburse those claims was thus triggered.

In considering the SIPC's claim, the Supreme Court found the link too remote between the conspirators' stock manipulation and the harm to customers, "being purely contingent on the harm suffered by the broker dealers." — U.S. at —, 112 S.Ct. at 1319. Only the "intervening insolvency [of the broker-dealers] connects the conspirators' acts to the losses suffered by the nonpurchasing customers and general creditors." *Id.* The Court further explained that allowing the nonpurchasing customers to sue, or allowing the SIPC to stand in their shoes, would require an analysis of whether the insolvency was caused by the alleged stock manipulation scheme or other factors such as poor business practices. *Id.* at —, 112 S.Ct. at 1320. Assuming that this factual assessment could be successfully undertaken, the district court would also have to apportion damages between the defunct broker-dealers and the non-purchasing customers. *Id.* These considerations resulted in the Court's conclusion that neither the SIPC nor the non-purchasing customers were proper plaintiffs.

Plaintiffs rely most heavily on a comparison of this case to *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982). In that case, a health plan subscriber brought an antitrust claim against her health plan insurer for damages due to an alleged conspiracy to prevent clinical psychologists from receiving compensation under the Blue Shield plan to the benefit of physicians and psychiatrists providing psy-

chotherapy services. Defendant Blue Shield denied reimbursement to McCready for the bills she paid to her psychologist. Blue Shield allegedly desired to motivate subscribers not to seek treatment from psychologists by denying them reimbursement for such services. The Supreme Court found that McCready's claimed damage, easily quantified, was an integral and necessary aspect of the alleged illegal conspiracy. *Id.* at 479, 102 S.Ct. at 2548. The Court reasoned that the "injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market." *Id.* at 484, 102 S.Ct. at 2551.

Plaintiffs argue that the Complaint alleges that Defendants intended to cause a price decline in both the futures and cash markets. Plaintiffs further allege that the exposure of Defendants or affiliated trading firms and their clients on the futures market as holders of gross short positions exposed them to financial loss that they averted by causing a price decline in the futures market. Furthermore, the Plaintiffs assert that some of the affiliated trading firms and their clients had obligations to customers to supply them with large amounts of soybeans. Because these entities had not legitimately hedged their needs on the futures market, they were subject to losses from the high and allegedly increasing cash market prices. Plaintiffs argue that these allegations show that a cash market price decline was not only intended but necessary for the accomplishment of the alleged conspirators' goal to reduce their exposure on both the futures and cash markets.

Plaintiffs' reliance on *McCready* is misplaced. In many ways, *McCready* was a straight forward case because the plaintiff was a consumer in the relevant market for psychotherapy services and was directly affected by the defendant's decision to deny her reimbursement for services performed by a psychologist as part of a scheme to deprive psychologists of business. We do not find the present suit comparable. In this case, Plaintiffs did not participate in the futures market and the Resolution was directed at that market. Nor could one say that Defendants' conduct is remotely as direct as

denying an insured coverage for certain services. The unpaid bills in *McCready* are a long way from the intricacies of the soybeans futures and cash markets here.

We may condense the arguments in favor of standing to ones similar to those found in *Associated General Contractors.* In simple terms, Plaintiffs have alleged an injury causally related to Defendants' conduct and have alleged that Defendants intended to cause a decline in prices in the cash market as a necessary part of their conspiracy. As the Court noted in *Associated General,* however, "an allegation of improper motive, although it may support a plaintiff's damage claim under § 4, is not a panacea that will enable any complaint to withstand a motion to dismiss." 459 U.S. at 537, 103 S.Ct. at 908. Moreover, even if we assume that the decline in prices allegedly caused by Defendants' conduct is the type of injury protected by antitrust law, this is not sufficient to confer standing "because a party may have suffered antitrust injury but still not be a proper plaintiff under § 4 for other reasons." *S.W. Suburban,* 830 F.2d at 1377. Those other reasons raise a substantial, and in our view, insurmountable hurdle in this case.

While a causal link between the soybean futures market and the soybean cash market exists, we find the causal chain between Defendants' conduct and Plaintiffs' claimed injuries too indirect and attenuated to support antitrust standing here. In similar circumstances, the Second Circuit found a plaintiff who operated in the copper scrap market did not have standing to challenge the conduct of defendants who operated in the refined copper market. *Reading Industries, Inc. v. Kennecott Copper Corp.,* 631 F.2d 10 (2d Cir.1980), *cert. denied,* 452 U.S. 916, 101 S.Ct. 3051, 69 L.Ed.2d 420 (1981). Though *Reading* was decided prior to *Associated General Contractors,* its analysis of the difficulties in tracing the impact of anticompetitive conduct from one portion of the copper market to another is still viable and helpful here. The Second Circuit found that the task of reconstructing innumerable individual decisions and countless market variables to gauge the effect of an alleged conspiracy in the market for refined copper on the price of

copper scrap would "mire the court" in a difficult, if not impossible, effort to recreate the "possible permutations in the causes and effects of a price change." *Id.* at 13–14; *see also de Atucha v. Commodity Exchange, Inc.*, 608 F.Supp. 510 (S.D.N.Y.1985) (applying *Reading* to claim of London silver futures market participant against defendants operating in United States silver futures market).

In this case, the task of deciphering the effect of the parade of imponderables asserted by Defendants in this case is similar to the task that proved too speculative for the Second Circuit in *Reading.* To trace the effect of the Resolution, this Court would have to look first to conditions in the soybean futures and cash markets well prior to the issuance of the Resolution. The Court would have to determine the cause of the allegedly rising price for futures and cash market soybeans.[9] That determination, if it could be made, would then lead to analysis of the Resolution's effect on futures traders and, through their actions, its effect on futures prices. Along the way, the Court would necessarily have to consider the countless interactions of innumerable market variables over a period of time before and after issuance of the Resolution. All this would only provide, at best, a view of the futures market price decline and its potential causes.

To reach the Plaintiffs' injuries, the Court would have to further speculate on the complex interaction between the futures markets and the numerous cash markets. As we previously mentioned, the conduct of countless individual decision-makers and multiple market variables varying by locality exacerbate the impediments to successful completion of this analysis. In the end, we may assume that the causal chain exists but the

Court nonetheless finds that the attenuated nature of that chain's links weighs against standing for Plaintiffs.

In addition to the indirectness of the injury to Plaintiffs, Defendants argue that Plaintiffs' damages are speculative and "defy apportionment." To a great degree, this argument follows from the indirectness of the Plaintiffs' injuries. Plaintiffs contend that lower prices are direct and not speculative damages and that no overwhelming questions of apportionment exist. As in *Holmes*, this case would require the Court to determine what damages in the form of a price decline are attributable to Defendants' conduct as opposed to other market variables too numerous to mention. That calculation is further hampered by the additional variable of multiple cash markets with potentially differing local variables affecting cash prices. In consideration of these extraordinary difficulties, we find again that the balance tips against granting Plaintiffs standing to pursue their claim.

Finally, we consider an important factor that neither party addresses directly. In *Associated General Contractors* and in numerous other cases, courts have recognized that where a more directly harmed class of potential plaintiffs exists, the need to allow a more remotely harmed class to proceed is substantially diminished. *Associated General Contractors*, 459 U.S. at 542, 103 S.Ct. at 911; *see also Holmes*, — U.S. at —, 112 S.Ct. at 1320; *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 111 n. 6, 107 S.Ct. 484, 490 n. 6, 93 L.Ed.2d 427 (1986). In this case, an easily identifiable group of potential plaintiffs exists whose harm from the Resolution is far more direct than Plaintiffs. Those traders who participated in the futures market experienced the effects of the Resolu-

---

**9.** Though not mentioned by either party, this case is perhaps further complicated by the absence of a potential party, Ferruzzi, which plays a central role in this saga. As the *Hearing* testimony indicates, the CFTC and the CBOT were concerned that Ferruzzi was attempting a squeeze that could and conceivably did contribute to the higher futures prices that allegedly prevailed prior to the issuance of the Resolution. As one court observed about the antitrust claims of traders in the silver futures market, "the magnitude of plaintiff's losses, if not the very potential for those losses, was directly determined by the actions allegedly taken by the non-exchange defendants to boost the price of silver futures." *Grosser v. Commodity Exchange, Inc.*, 639 F.Supp. 1293, 1319 (S.D.N.Y.1986), *aff'd*, 859 F.2d 148 (2d Cir.1988). Thus, it appears quite clear that the market conditions both before and after the issuance of the Resolution are not only relevant but essential to analyzing the potential impact of the Resolution on the soybean futures market.

tion most directly, especially those traders who held long positions who stood to lose from a price decline. Their self-interest would normally be sufficient to protect the public interest in antitrust enforcement. Futures market participants have brought suits against exchanges and boards of trade seeking relief under antitrust law in the past. *See, e.g., Grosser v. Commodity Exchange, Inc.,* 639 F.Supp. 1293 (S.D.N.Y.1986); *de Atucha v. Commodity Exchange, Inc.,* 608 F.Supp. 510 (S.D.N.Y.1985). Accordingly, the Court concludes that this factor also weighs heavily against Plaintiffs' standing.

The preceding discussion demonstrates that Plaintiffs' claim is indirect and attenuated and creates enormous levels of complexity and speculation regarding both causation and damages. Moreover, another more directly harmed group exists and that group could protect the public interest in antitrust enforcement. Allowing Plaintiffs to proceed would involve this Court in the type of complex and massive damages litigation that undermines the effectiveness of treble-damage suits. Accordingly, the Court holds that Plaintiffs lack standing to pursue their claim under § 4 of the Clayton Act.[10]

### *AAM—Representational Standing*

 Even if we assume for the moment that Plaintiffs' claims are sufficient to overcome Defendants' other standing arguments, the Court finds that AAM lacks standing to represent its members. AAM seeks to represent the interests of its soybean farmer members in pursuing this action but there are no allegations that AAM itself has suffered any damages. Defendants assert that AAM lacks standing to represent its members because this suit involves issues of damages that require the participation of individual members. *See Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). AAM contends that damage actions are not necessarily "excluded from the category of cases in which associations have standing."

The Seventh Circuit has recognized the uniform rejection of associational standing under § 4 of the Clayton Act. *S.W. Suburban,* 830 F.2d at 1380 n. 3 (collecting cases). The court noted that both the language of § 4 and the test enunciated in *Hunt* barred an association's standing in a suit to recover damages to its members under § 4. *Id.* This Court finds no reason to depart from this authority and holds that AAM lacks standing to represent its members in this suit.

### CONCLUSION

For the foregoing reasons, the Court grants the Defendants' motion to dismiss.

---

10. Lest their be any doubt, even had we found that those Plaintiffs who refrained from selling had standing under Article III, our analysis and conclusion with respect to that class of Plaintiffs would not differ. In fact, the class of Plaintiffs who refrained from selling soybeans is one step further down the already attenuated causal chain and the damage assessment would have an added level of difficulty for these Plaintiffs.