**Harvey J. SANNER, Warren D. Jones, also known as Corky, H. Dean Adkins, et al., Plaintiffs–Appellants,**

**v.**

**BOARD OF TRADE OF the CITY OF CHICAGO, Patrick H. Arbor, Donald G. Andrew, et al., Defendants–Appellees.**

Nos. 94–2139, 94–2152.

United States Court of Appeals, Seventh Circuit.

Argued March 31, 1995.

Decided Aug. 7, 1995.

**920**

John F. Arens, Steve Alexander, Arens & Alexander, Fayetteville, AR, Patrick F. Daly, Palos Heights, IL, Terrance G. Reed (argued), Washington, DC, for Harvey J. Sanner, Warren D. Jones, H. Dean Adkins, Judy F. Adkins.

Mark D. Young, Kristen A. Denison, Kirkland & Ellis, Washington, DC, Garrett B. Johnson (argued), Robert S. Steigerwald, Kirkland & Ellis, Chicago, IL, for Chicago Bd. of Trade.

Garrett B. Johnson, Robert S. Steigerwald, Kirkland & Ellis, Chicago, IL, for Patrick H. Arbor, Donald G. Andrew, John F. Benjamin, Gary K. Blelfeldt, David P. Brennan, John J. Brogan, Thomas R. Donovan, Lawrence C. Dorf, Burton J. Gutterman, Hal T. Hansen, Glenn P. Hollander, Bruce H. Johnson, Dale E. Lorenzen, Karsten Mahlman, Silas Matthies, Sr., John W. Meriwether, Lester Mouscher, Jay C. Nolan, Thomas C. O'Halleran, Irwin N. Smith, Carl M. Zapffe, Charles P. Carey, J. Robert Collins, Philip G. Hubbard, David L. Seagren and Wallace G. Weisenborn.

John F. Arens, Steve Alexander, Arens & Alexander, Fayetteville, AR, Patrick F. Daly, Palos Heights, IL, Terrence G. Reed (argued), Reed & Hostage, Washington, DC, for American Agriculture Movement, Inc.

Mark D. Young, Kristen A. Denison, Kirkland & Ellis, Washington, DC, Garrett B.

Johnson (argued), John E. Angle, Robert S. Steigerwald, Sara Rollins Slaughter, Kirkland & Ellis, Scott E. Early, Chicago, IL, for Board of Trade of City of Chicago.

Before CUDAHY and COFFEY, Circuit Judges, and WALTER, District Judge.[*]

CUDAHY, Circuit Judge.

This is the second appeal from an antitrust challenge asserted by the American Agricultural Movement and a number of named soybean farmers. The plaintiffs claim that a Resolution adopted by the Chicago Board of Trade, which generally required persons holding a certain number of soybean futures contracts to liquidate a percentage of their positions, violated the Sherman Antitrust Act. The district court dismissed their complaint for lack of standing. It first concluded that the American Agricultural Movement lacked associational standing to pursue the claims of its member farmers. Second, it determined that the individual farmers themselves lacked standing. The district court found that those farmers refraining from the sale of soybeans because of a depressed price allegedly caused by the Resolution lacked standing under Article III of the Constitution; those farmers actually selling soybeans at this depressed price lacked standing under the antitrust laws. Although we agree with the district court's conclusions concerning associational standing and Article III standing, we believe its dismissal of the complaint on the grounds of antitrust standing was premature. We therefore affirm in part and reverse and remand in part.

## I.

The American Agricultural Movement (AAM) is a nonprofit organization representing the interests of farmers. This organization, along with several named soybean farmers who grow and sell soybeans, brought suit against the Chicago Board of Trade (CBOT) and various individuals associated with it. They generally complained of the CBOT's

[*] The Hon. Donald E. Walter, District Judge for the Western District of Louisiana, sitting by designa-
tion.

July 11, 1989 Emergency Resolution (Resolution), which required all holders of gross long positions in soybean futures contracts to liquidate their positions by at least 20 percent daily until July 20, 1989, the last trading day for the July 1989 contracts. They claim, essentially, that the Resolution was prompted by a conspiracy to cause a precipitous drop in soybean cash crop prices and to maintain those prices at artificially depressed levels. Because soybean farmers either sold at these depressed prices, or refrained from selling because of them, they allegedly suffered injury at the hands of the CBOT.

AAM and the farmers alleged various causes of action in their complaint against the CBOT, including violations of the Commodity Exchange Act (CEA), the Sherman Antitrust Act and state common law. The district court initially dismissed the complaint, holding, *inter alia,* that the CEA had repealed the plaintiffs' antitrust claims by implication. *American Agriculture Movement, Inc. v. Board of Trade,* 770 F.Supp. 407 (N.D.Ill.1991). On appeal, we affirmed the district court's dismissal of the CEA and common law claims, but held that the CEA did not repeal the antitrust claims by implication. *American Agriculture Movement, Inc. v. Board of Trade,* 977 F.2d 1147 (7th Cir.1992). We therefore remanded the antitrust claims to the district court for further proceedings. *Id.* at 1167.

On remand, the CBOT filed a motion to dismiss the remaining antitrust claims under Rules 12(b)(1) and 12(b)(6), and the district court again dismissed the plaintiffs' complaint. It held that the AAM lacked standing as an association to pursue the interests of its members. In addition, it believed that the claims of individual farmers should be dismissed. The farmers who refrained from selling soybeans because of the allegedly depressed price, in the district court's view, lacked Article III standing, although the farmers complaining because they sold soybeans at the lower prices satisfied Article III's standards. The district court believed, however, that this latter group of selling farmers lacked standing under the antitrust laws. Both AAM and the individual farmers contend that dismissal was erroneous.

The Emergency Resolution that lies at the root of this controversy was prompted by the CBOT's surveillance of the soybean futures market. The CBOT, along with the Commodity Futures Trading Commission (CFTC), was concerned about the activities of Ferruzzi Finanziaria S.p.A. and its affiliates (Ferruzzi), which had amassed an unusually large soybean futures position that the CBOT believed threatened orderly trading. *See generally American Agriculture Movement,* 977 F.2d at 1151 (detailing Ferruzzi's position). After Ferruzzi refused repeated requests to reduce its position, the CFTC and the CBOT acted.

On July 11, 1989, the CFTC sent a private letter to Central Soya, a member of Ferruzzi. This letter determined that Ferruzzi's position was a threat to orderly liquidation of soybean futures, and consequently revoked the regulatory exemption that had allowed Central Soya to amass its large position. The CBOT claims that this letter would have required Ferruzzi to liquidate over 3,400 long July soybean futures contracts in one week.

Later that day, after the close of trading, the CBOT issued the Emergency Resolution. The Resolution, in contrast to the CFTC's letter, was publicly issued and applied to all traders. It specified that:

> Effective as of the opening of the market on July 12, 1989, any person or entity, either alone or in conjunction with any other person or entity, who owns or controls a gross long or gross short position for any purpose whatsoever in excess of three million bushels in the July 1989 soybean futures contract traded on the Exchange must reduce said position and subsequent positions by at least 20% per trading day subject to the following absolute limits.

> No person or entity, either alone or in conjunction with any other person or entity, shall own or control a gross long or gross short position for any purpose whatsoever in the July 1989 soybean futures contract traded on the Exchange in excess of three million bushels as of the close of trading on Tuesday, July 18, 1989.

> No person or entity, either alone or in conjunction with any other person or enti-

ty, shall own or control a gross long or gross short position for any purpose whatsoever in the July 1989 soybean futures contract traded on the Exchange in excess of one million bushels as of the close of trading on Thursday, July 20, 1989.

This resolution is applicable to all positions, whether hedge or speculative. Ferruzzi reduced its position in July 1989 soybean futures contracts to comply with these two orders. The plaintiffs claim that the Resolution eventually led to a price decline in the July 1989 soybean futures market, which resulted in a proportionate decline in the cash market for soybeans. They further suggest that the individual defendants, acting through CBOT, intended to cause a price decline in both markets in order to benefit clients in trading houses, who held short positions in soybeans and who had failed to hedge against actual soybean purchasing needs. The price decline in the soybean market ultimately harmed the farmers, who are cash market sellers of soybeans.

## II.

The district court's holding requires us to examine a trio of standing doctrines. We agree with its conclusion that the AAM lacked standing as an association to pursue the interests of its member farmers. We also agree with the district court's conclusion that the farmers who allegedly refrained from selling soybeans because of the depressed price lacked standing under Article III. We find questionable, however, the district court's conclusion that the farmers who sold soybeans at depressed prices lacked antitrust standing. We will discuss each conclusion in turn.

■ Under Article III of the Constitution, a party must demonstrate standing in order to satisfy the "case or controversy" requirement necessary to the exercise of our judicial power. *Simmons v. I.C.C.*, 900 F.2d 1023, 1026 (7th Cir.1990), *cert. denied*, 499 U.S. 919, 111 S.Ct. 1308, 113 L.Ed.2d 242 (1991). The standing inquiry demands a three-part showing: "(1) the party must personally have suffered an actual or threatened injury caused by the defendant's allegedly illegal conduct, (2) the injury must be fairly tracea-

ble to the defendant's challenged conduct, and (3) the injury must be one that is likely to be redressed through a favorable decision." *Id.* (quoting *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982)).

■ As the above test demonstrates, an injured party is ordinarily required to assert his own legal rights and interests; he cannot ordinarily rest his claim for relief upon the rights of third parties. *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). As an alternative to this general requirement, however, an association may have the right under the doctrine of associational standing, even in the absence of an injury to itself, to sue on behalf of its members. *Id.* at 511.

### A. *Associational Standing*

■ The circumstances under which an association is entitled to so maintain suit were enunciated in *Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). There, the Supreme Court stated:

[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

432 U.S. at 343, 97 S.Ct. at 2441. *See also Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 600 (7th Cir.1993). Though an association must satisfy each of the prongs of the test, only the third is at issue here. The CBOT contends, and the district court agreed, that the relief that the plaintiffs request would require the participation of individual members in the lawsuit.

■ The AAM intends to represent its members claiming a violation of the Sherman Antitrust Act. To do so, it will assert a claim for § 4 damages under the Clayton Act, 15 U.S.C. § 15. Its essential claim is that each of its soybean farmer members—those sell-

ing soybeans at an allegedly depressed price and those refraining from sale because of that price—suffered a calculable injury. Such a suit would apparently require the calculation of damages for each of the individual farmers. In light of this factor, allowing the AAM to proceed on behalf of the individual farmers would run afoul of Hunt's third prong, which states that the relief requested should not require that individual members participate in the lawsuit. *See Southwest Suburban Board of Realtors, Inc. v. Beverly Area Planning Ass'n*, 830 F.2d 1374, 1380 n. 3 (7th Cir.1987) (noting that courts have "uniformly rejected" associational standing in claims for money damages under § 4 of the Clayton Act).

We are not aware of any cases allowing associations to proceed on behalf of their members when claims for monetary, as opposed to prospective, relief are involved. *See United Union of Roofers, Waterproofers, and Allied Trades No. 40 v. Insurance Corp. of America*, 919 F.2d 1398, 1400 (9th Cir.1990) ("no federal court has allowed an association standing to seek monetary relief on behalf of its members"); *Telecommunications Research & Action Center v. Allnet Communication Services, Inc.*, 806 F.2d 1093, 1095 (D.C.Cir.1986) (listing cases); *Local 194 v. Standard Brands, Inc.*, 540 F.2d 864, 865 (7th Cir.1976). The basis for the distinction between the types of relief requested is *Hunt*'s third prong. As the Eighth Circuit has noted, "problems regarding the proof and allocation of § 4 damages require the full and personal participation of all claimants, [but] § 16 injunctive relief can issue to the benefit of all injured association members without requiring their individual participation." *Associated General Contractors v. Otter Tail Power Co.*, 611 F.2d 684, 690 (8th Cir.1979).

Here, the AAM seeks nothing but damages on behalf of the member farmers. Pl. Complaint at 22. Although the individual calculation of damages for each soybean farmer might be rather technical and uncomplicated, the individual participation of all members asserting a claim would nevertheless be required. *See Telecommunications Research*, 806 F.2d at 1095 (rejecting claim that formu-

laic damage calculation should excuse application of *Hunt*'s third prong). *See also Self-Insurance Institute of America v. Korioth*, 53 F.3d 694 (5th Cir.1995). When the suit would require participation by "each injured party," recognizing an association's standing is inappropriate. *Retired Chicago Police*, 7 F.3d at 601. We therefore affirm the district court's dismissal of the AAM's complaint.

### B. *Article III Standing*

■ Dismissal of the AAM's complaint does not dispose of matters between the parties; six proposed members of a class of soybean farmers have also filed suit. Of these, some assert that the depressed price of soybeans caused them to refrain from selling soybeans. Others complain of being forced to sell soybeans at a depressed price. Both groups seek to recover monies lost due to the decline in price allegedly attributable to the adoption of the Resolution. The district court concluded that the first group, the refrainers, lacked standing under Article III. It also determined that the second group, the sellers, satisfied Article III's requirements. The parties dispute both conclusions on appeal. We agree with the district court's determinations.

As noted, one of Article III's requirements is that of traceability or, put differently, whether a party can demonstrate that the injury of which he complains is "fairly traceable" to the challenged conduct of the defendants. *See generally Simmons*, 900 F.2d at 1026. Here, the CBOT contends that neither of the two different injuries of which the farmers complain are "fairly traceable" to the Resolution.

We have little difficulty concluding that the soybean farmers who refrained from selling soybeans due to the depressed price of the cash market lack standing under Article III. One aspect of the traceability requirement is that a plaintiff be able to establish "links in the chain of causation" between the complained of injury and the challenged conduct. *See Allen v. Wright*, 468 U.S. 737, 759, 104 S.Ct. 3315, 3328–29, 82 L.Ed.2d 556 (1984). Here, as the district court noted,

Farmers may decide not to sell soybeans at any given time for a host of articulable

and inarticulable reasons such as a belief that prices will climb, excessive transportation costs, low storage costs, the poor quality or quantity of available supply, or a continuing relationship with a particular buyer who promises to buy in the future.... these considerations would vary from region to region and from farmer to farmer.

848 F.Supp. 814, 821. The decision to sell or not to sell is not clearly attributable to a drop in the price of soybeans (nor will it ever be). We simply will not be able to determine whether a particular farmer participating in the soybean cash market refrained from selling soybeans because of price. As the Supreme Court has noted in a slightly different context, "[p]laintiff's proof would not be that he purchased or sold stock, a fact which would be capable of documentary verification in most situations, but instead that he decided *not* to purchase or sell ... [a factor] dependent upon uncorroborated oral evidence." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 746, 95 S.Ct. 1917, 1930, 44 L.Ed.2d 539 (1975) (holding that individuals who neither purchased nor sold stock lacked standing under the securities laws to claim misleading stock prospectus led them to refrain from purchasing). The difficulties that inhere in an attempt to show that an individual farmer's decision *not* to sell was attributable solely to price are considerations relevant to constitutional analysis.

■ The farmers apparently do not contest the district court's findings on this issue. Instead, they suggest that such a conclusion flows from an impermissible examination of facts outside of the face of the complaint. Specifically, they suggest that despite the presence of a motion under Fed.R.Civ.P. 12(b)(1) concerning jurisdiction, the district court paid inadequate heed to the tenet of Fed.R.Civ.P. 12(b)(6) that the facial allegations of a complaint must be taken as true. *See, e.g., Xerox Corp. v. Genmoora Corp.*, 888 F.2d 345, 350–51 (5th Cir.1989) ("Because in this case the challenged basis of jurisdiction, failure to allege injury, is also an element of the cause of action, the proper course is to limit the jurisdictional inquiry to facial scrutiny and reserve factual scrutiny for the mer-

its."); *see also Peckmann v. Thompson*, 966 F.2d 295, 297 (7th Cir.1992).

We do not believe that the district court, in granting the CBOT's motion to dismiss the non-selling farmers, looked beyond the face of the complaint. Instead, the district court determined as a matter of law that causation was sufficiently tenuous to create a problem tracing the alleged injury to the complained-of action.

This determination has little to do with the facts inside, or outside, the plaintiffs' complaint. It is rather a conclusion that the content of the plaintiffs' factual allegations is irrelevant in light of the problems of causation involved in proving this sort of case. That is, the district court determined that the farmers refraining from selling soybeans lacked standing to sue for their injury no matter what facts they might later be able to adduce. Each individual farmer's decision to refrain from selling could not, as a matter of law, be traced to the price decline allegedly caused by the CBOT's Resolution. *See Blue Chip*, 421 U.S. 723, 95 S.Ct. at 1919. A ruling concerning the legal sufficiency of the complaint is an appropriate determination to make in response to a motion to dismiss. *See Gomez v. Illinois State Board of Education*, 811 F.2d 1030, 1039 (7th Cir.1987); *Pierre v. United Parcel Service, Inc.*, 774 F.Supp. 1149, 1150 (N.D.Ill.1991). The district court therefore did not err in concluding that the farmers refraining from sale lacked standing under Article III.

Neither did the district court err in determining that the farmers who sold soybeans at allegedly depressed prices suffered an injury sufficient to confer standing under Article III. This group of farmers does not face the noted problem of the nonselling farmers—namely, that of showing that the decision to sell or not was *really* attributable to the price decline (and not due to more idiosyncratic factors). Instead, it is clear that this group of farmers sold soybeans. The fact of a sale at an allegedly depressed price establishes discernible injury in a manner in which a failure to sell cannot. *See Blue Chip*, 421 U.S. at 743, 95 S.Ct. at 1929 (such a rule "separates in a readily demonstrable manner the group of plaintiffs who actually

purchased or actually sold ... from the vastly larger world of potential plaintiffs who might successfully allege a claim but could seldom succeed in proving it").

The group of selling farmers nevertheless faces a traceability hurdle under Article III; they must demonstrate that some decline in price is fairly traceable to the CBOT's Resolution. The CBOT contends that the farmers cannot succeed in this demonstration. First, the CBOT suggests that the CFTC's private letter to Ferruzzi issued earlier in the day of July 11th was a superseding cause of the price decline which essentially deprived the CBOT's resolution of any discernible effect. Second, the CBOT claims that "multiple economic factors" influenced the cash market for soybeans. The district court rejected both of these contentions, and we agree with its conclusions.

The CBOT first suggests that the price decline could just as easily have been traced to the CFTC's private letter to Ferruzzi. This letter, the CBOT claims, caused Ferruzzi to liquidate a substantial portion of soybean futures—just as compliance with the Resolution would eventually have done. If Ferruzzi's mass liquidation is in fact the cause of a decline in prices, the CBOT reasons that the letter, which issued prior to the CBOT's Resolution and required compliance on an earlier date, was the *real* cause of the price decline. *See, e.g., Simmons,* 900 F.2d at 1026 (alleged injury arising from inability to ship goods along abandoned rail line not traceable to ICC's conduct because the line had ceased to be used well before the ICC approved of the abandonment).

We cannot, in reviewing a motion to dismiss, accept the chain of causation that the CBOT urges. It is well-established that at this stage of pleading we must accept the factual allegations contained in the complaint as true. *Northeastern Florida Contractors v. Jacksonville,* — U.S. —, —, 113 S.Ct. 2297, 2304, 124 L.Ed.2d 586 (1993); *Gomez,* 811 F.2d at 1039. Adjunct to this

principle is the requirement that we view those allegations in the light most favorable to the plaintiff and make all reasonable inferences in his favor. *Gomez,* 811 F.2d at 1039. "By the same token, the defendant cannot, in presenting its 12(b)(6) challenge, attempt to refute the complaint or to present a different set of allegations." *Id.*

■ This standard is not altered here by the fact the CBOT claimed that the farmers lacked standing under Rule 12(b)(1). When a defendant challenges *standing* via a motion to dismiss, "both trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth,* 422 U.S. at 501, 95 S.Ct. at 2206. *See also Region 8 Forest Service Timber Purchasers Council v. Alcock,* 993 F.2d 800, 806 (11th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 683, 126 L.Ed.2d 651 (1994); *Jacobs v. Barr,* 959 F.2d 313, 316–17 (D.C.Cir. 1992); *Cramer v. Skinner,* 931 F.2d 1020, 1025 (5th Cir.), *cert. denied,* 502 U.S. 907, 112 S.Ct. 298, 116 L.Ed.2d 242 (1991). Because the CBOT challenged the farmers' standing with a motion to dismiss, we must accept the farmers' factual allegations and resolve any doubts in their favor.

■ The CBOT is essentially asking us to ignore these principles here. It may be that the CFTC's private letter to Ferruzzi had some downward effect on price. But the extent to which the price decline is attributable to the CFTC's letter, as opposed to—as plaintiffs allege—the CBOT's Resolution, is not a matter that a court should attempt to sort out on a motion to dismiss. The fact that another party's action may—and we emphasize may—have had some impact on soybean prices does not necessarily negate the influence of the CBOT's Resolution. Whatever the effect of the CFTC's letter, it is still quite plausible that the CBOT's Resolution played some role in setting the cash price for soybeans.[1] For this reason, the district

---

1. We further note, as did the district court, that the numerous differences between the CBOT's Resolution and the CFTC's private letter further cloud any attempt to understand, on a motion to dismiss, the precise impact of either document. The Resolution applied to all traders, while the letter appears to have been directed only to one of the Ferruzzi affiliates. The Resolution was publicly issued, and the letter, privately. Finally, although the letter was issued prior to the Resolution, we question the causal relevance of one day for the purposes of a motion to dismiss.

court properly refused to grant the motion to dismiss.

The CBOT faces the same obstacle urging that other factors were responsible for the fall in soybean prices. It claims that other market factors, such as the weather, shipping costs and the like, as well as the purchasing decisions of a number of individual traders, also impacted the price of soybeans. Again, these factors are not relevant to the present inquiry, given the standard of scrutiny employed in ruling on a motion to dismiss. *See Gomez,* 811 F.2d at 1039; *Jacobs,* 959 F.2d at 316. These factors do not, in short, negate the plausible effect of the CBOT's Resolution, which the plaintiffs have suggested caused a decline in soybean prices. The district court was required to accept the plaintiffs' causal allegations as true, ultimately leaving for later an allocation of the precise impact that each of the market forces had on the price of soybeans.

Factual disputes over the relative market significance of the CFTC's letter and various external market forces should not be resolved on a motion to dismiss. We are well aware that Article III requires a plaintiff to demonstrate that his injury is "fairly traceable" to the complained-of conduct of defendants. *See Simmons,* 900 F.2d at 1026. But, if we accept as true the farmers' allegation that the Resolution, causing a mass liquidation of soybean futures contracts, prompted a drop in the cash price of soybeans, they have adequately alleged traceability. The district court therefore properly refused to grant the CBOT's motion to dismiss as to the farmers who sold soybeans at depressed prices.

### C. *Antitrust Standing*

As the preceding discussion makes clear, we believe the farmers have alleged injury sufficient to confer standing under Article III. Antitrust standing is, however, a distinct concept. *Associated General Contractors, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 907 n. 31, 74 L.Ed.2d 723 (1983). "Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make the further determination whether the plaintiff is a proper party to bring a private antitrust action." *Id.* Remaining aware of the differences between the doctrines, we disagree with the district court's conclusion that the farmers lacked anti-trust standing. This conclusion reflects, in part, the district court's failure to accept the allegations of the farmers' complaint as true. We therefore reverse this aspect of the district court's ruling and remand for further proceedings.

The district court held that the farmers who sold soybeans at depressed prices lacked standing under the anti-trust laws. It first determined that the cash market for soybeans was distinct from the futures market for the same commodity. 848 F.Supp. at 818. Because the Resolution was directed toward the futures market and because the plaintiffs did not themselves participate in the futures market, the district court concluded they had failed to allege an injury sufficiently direct to satisfy the standards of the antitrust laws. *Id.* at 821. The causal chain linking the futures market to the cash market was, in the district court's view, too attenuated to attribute any decline in the cash value of soybeans to manipulation of the futures market. *Id.* In addition, the district court was concerned about the speculative nature of any possible damages and the existence of a class of plaintiffs more appropriate to bring suit. *Id.* at 826.

Private civil actions to enforce the Sherman Act are allowed under § 4 of the Clayton Act, 15 U.S.C. § 15. That section provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue...." Despite this broad language, it is clear that "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an anti-trust violation." *Associated General Contractors,* 459 U.S. at 534, 103 S.Ct. at 906. Consequently, the Supreme Court has required the application of certain doctrines to restrict the scope of relief under § 4. One of these restrictive doctrines is that of antitrust standing, or the requirement that a plaintiff demonstrate "a direct link between the antitrust violation

and the antitrust injury." *Greater Rockford Energy & Technology Corp. v. Shell Oil Co.,* 998 F.2d 391, 395 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1054, 127 L.Ed.2d 375 (1994). Essentially, the doctrine of antitrust standing is the equivalent of the common-law tort limitation of proximate cause. *See Greater Rockford,* 998 F.2d at 394.

■ We have previously recognized, based on the factors considered by *Associated General Contractors,* the considerations relevant to determining whether a plaintiff has suffered an injury sufficient to confer antitrust standing. We noted, at bottom, that an antitrust standing inquiry involves a case-by-case analysis of "the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." *Greater Rockford,* 998 F.2d at 396 (quoting *Associated General Contractors,* 459 U.S. at 544–45, 103 S.Ct. at 911–12). *See also Nelson v. Monroe Regional Medical Center,* 925 F.2d 1555, 1562 (7th Cir.), *cert. denied,* 502 U.S. 903, 112 S.Ct. 285, 116 L.Ed.2d 236 (1991); *Southwest Suburban Board of Realtors,* 830 F.2d at 1377. In this respect, a court might consider a number of factors, such as:

> (1) [t]he causal connection between the alleged anti-trust violation and the harm to the plaintiff; (2) [i]mproper motive; (3) [w]hether the injury was of a type that Congress sought to redress with the antitrust laws; (4) [t]he directness between the injury and the market restraint; (5) [t]he speculative nature of the damages; (6) [t]he risk of duplicate recoveries or complex damages apportionment.

*Lovett v. General Motors Corp.,* 975 F.2d 518, 520 (8th Cir.1992) (listing factors drawn from *Associated General Contractors* ); *Peck v. General Motors Corp.,* 894 F.2d 844, 846 (6th Cir.1990) (same). But the standing determination is ultimately a product of the particularities of each case. *See Associated General Contractors,* 459 U.S. at 535–36, 103 S.Ct. at 907–08; *see also Bodie–Rickett & Associates v. Mars, Inc.,* 957 F.2d 287, 290 (6th Cir.1992) ("no single factor is conclusive").

■ Here, we believe that the farmers who sold soybeans at depressed prices have alleged an antitrust injury sufficient to withstand the CBOT's motion to dismiss. At base, our determination is guided by the principle that a court must accept a plaintiff's allegations as true when considering the propriety of a motion to dismiss. *See Gomez,* 811 F.2d at 1039. The farmers claim that the CBOT, by adopting and. publishing the Resolution, illegally restrained trade in violation of the Sherman Act. The Resolution, as stated, required the Ferruzzi group in particular, and other traders in general, to liquidate open long positions in the July 1989 soybean futures market. As we have previously recognized, "[u]pon adoption and publication of the Resolution, prices in the futures and cash markets plummeted; this price movement benefitted shorts at the expense of longs in the futures market, and benefitted buyers at the expense of sellers in the cash market." *American Agriculture Movement,* 977 F.2d at 1157.

The farmers here were the sellers in the soybean cash market, and they are presently complaining of the drop in prices. In their complaint, they allege, in particular, that the Resolution caused the prices of July 1989 soybean futures contracts to fall "precipitously." Pl. Complaint at 14–15. In addition, they assert that the Resolution "caused the soybean cash crop prices in the Relevant Cash Markets to fall in direct proportion to the CBOT soybean futures prices." *Id.* at 15. They therefore claim that the adoption and promulgation of the Resolution caused a decline in *both* the futures and cash markets. They further claim that the drop in cash prices was intentionally caused in order to benefit trading firms with whom the defendants were affiliated; because these trading firms had obligations to supply customers with large amounts of soybeans, they were faced with losses from having to purchase at high cash prices (unless they could benefit from a price decline). *Id.* at 17–18.

Despite these allegations, CBOT nevertheless contends that the farmers are not "proper plaintiffs" to complain about the effect, if any, of the Resolution. The CBOT primarily claims that the cash market for soybeans is distinct from the futures market for soybeans. Because its Resolution was directed

at the futures market for soybeans, and because the farmers do not participate in this market, it claims that any injury suffered by the farmers is too indirect to be recognized under the antitrust laws. In addition, it suggests that damages are speculative and difficult to apportion, and that persons other than the farmers should more appropriately complain.

We do not agree with the CBOT's view of the matter. We instead believe that the farmers' injury was sufficiently direct to withstand a motion to dismiss. In *Associated General Contractors,* the Supreme Court determined that a plaintiff suffering only indirect injury did not have standing to sue under the antitrust laws. There, labor unions complained, suggesting that a multiemployer association of construction contractors had coerced third parties to cause them to divert business from union contractors to nonunion contractors. The Supreme Court held that any injury complained of by the labor union was indirect, in part because there was "no assertion that any such firm was prevented from doing business with any union firms or that any firm or group of firms was subject to a complete boycott." 459 U.S. at 542, 103 S.Ct. at 911. The directly injured parties, in the Supreme Court's view, were the firms that had been allegedly coerced; the complaining unions had been injured only secondarily.

Since the Supreme Court handed down *Associated General Contractors,* courts have denied standing for injuries that they characterize as "indirect." In *Southwest Suburban,* for instance, we determined that despite the fact that the president of a company may have been harmed by a reduction of his salary or other benefits due to injury to the company, he did not have standing to assert an antitrust claim. 830 F.2d at 1378. We said that the injury, instead of being "separate and distinct" from that of the company, was merely "derivative." *Id. See also Sullivan v. Tagliabue,* 25 F.3d 43, 51 (1st Cir. 1994) (stadium owner claiming that NFL rule violated antitrust laws by placing restrictions on public offerings of shares in football teams had no standing because team more directly injured); *Sharp v. United Airlines,* 967 F.2d

404, 408–09 (10th Cir.) (employees of airline alleging that conspiracy to restrain trade drove airline out of business did not have standing to complain of antitrust injury arising out of job loss), *cert. denied,* —— U.S. ——, 113 S.Ct. 464, 121 L.Ed.2d 372 (1992); *Peck,* 894 F.2d 844, 847–48 (6th Cir.1990) (owners and officers of car dealership did not suffer direct injury from alleged conspiracy forcing dealership out of business).

The CBOT claims that the injury of which the farmers complain—that of depressed soybean prices—is similarly indirect and derivative. Its view depends entirely upon the disjunction that it maintains exists between the cash market and the futures market for soybeans. Although there is obviously a difference between cash markets and futures markets, we do not believe this difference results in the sort of market division that CBOT points to here.

There are certainly differences between futures markets and cash markets. In a cash market, the commodity itself is traded; here, for instance, soybeans are purchased and sold. In a futures market, by contrast, contracts for the commodity are traded. For example, one who sells a soybean contract ("goes short") promises to make delivery in a later month, and one who purchases a soybean contract ("goes long") agrees to accept delivery in a later month. The actual delivery of soybeans rarely ever occurs, however. Instead, one who is short or long will offset his position by buying the same number of contracts of the opposite kind in order to balance his position and meet his commitment. *See generally* I Philip Johnson & Thomas Hazen, Commodities Regulation § 104 (2d ed. 1989); *Utesch v. Dittmer,* 947 F.2d 321, 324 (8th Cir.1991) (discussing the cash and futures markets for cattle), *cert. denied,* 503 U.S. 1006, 112 S.Ct. 1764, 118 L.Ed.2d 425 (1992). Nevertheless, futures contracts create legal rights in both buyer and seller—the first to demand actual delivery, and the second, to make it. And, at some point in each month, "all futures trading by offset may be required to cease and the contract then becomes truly a spot sale of the underlying commodity or cash equivalent." I Johnson & Hazen at § 1.17.

The fact that cash and futures markets may be distinguished certainly does not show that they are unrelated for the purposes of antitrust standing analysis. The district court in fact recognized their relation. It is clear that "[w]hen the futures market experiences a significant price change, the prices of that commodity in the cash market will usually experience a similar movement." I Johnson & Hazen at § 104 (noting that futures prices and cash market prices tend to follow similar patterns). The reason for this is obvious: both markets involve the same commodities to be delivered currently or in the future. Since one market tends to move in lockstep with the other, participants in the cash market can be injured by anticompetitive acts committed in the futures market. The futures market and the cash market for soybeans are thus "so closely related" that the distinction between them is of no consequence to antitrust standing analysis. *See Amey, Inc. v. Gulf Abstract & Title, Inc.,* 758 F.2d 1486, 1496 (11th Cir.1985) (plaintiff real estate investment company had standing to sue for alleged price fixing for legal opinions for real estate title insurance despite fact that plaintiff was not in business of procuring or providing legal title opinions or title insurance), *cert. denied,* 475 U.S. 1107, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986).

In any event, even if we were to assume (contrary to our conviction) that there is a distinction between markets that is relevant to antitrust standing, the farmers here have alleged that one of the CBOT's objectives in adopting the Resolution was to prompt a price decline in the cash market for soybeans. This allegation of direct harm—the claimed experience of the sudden artificial drop in cash market prices—is sufficient to withstand a motion to dismiss. This injury distinguishes the present case from the derivative injury that the Supreme Court refused to recognize in *Associated General Contractors.* In *Associated General Contractors,* "any [of the Union's] injuries were only an indirect result of whatever harm may have been suffered by 'certain' construction contractors and subcontractors." 459 U.S. at 541, 103 S.Ct. at 910. The Union had therefore attempted to assert an indirect, or secondary, injury. *Id.* Here, in contrast, the injury the farmers claim to have suffered is in no sense "derivative." The farmers are not attempting to stand in the shoes of a third party or to complain of the secondary consequences arising from an injury to a third party. *See, e.g., Southwest Suburban,* 830 F.2d at 1378. *See also Illinois Brick Co. v. Illinois,* 431 U.S. 720, 737–38, 97 S.Ct. 2061, 2070–71, 52 L.Ed.2d 707 (1977) (rejecting idea that potential plaintiffs at each level in the distribution chain could recover from inflated prices resulting from price-fixing conspiracy). Instead, the farmers' injury allegedly occurred as an intentional result of the adoption and promulgation of CBOT's Resolution. The close and continuous link between the cash and futures markets lends plausibility to this allegation; though the Resolution may have been directed at the futures market, it predictably would have impacted the cash market as well. Because of this relation, the allegation of an intention to cause a cash market decline is much more than the mere allegation of improper motive that the Court found lacking in *Associated General Contractors,* 459 U.S. at 537, 103 S.Ct. at 908. This is instead an allegation of a plausible cause and intended effect.

The close relationship between the cash and futures markets for soybeans makes this case more like *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), than like *Associated General Contractors.* In *McCready,* the Supreme Court found that a patient treated by a clinical psychologist had suffered antitrust injury from an insurer's refusal to reimburse the fees paid because of a limitation of coverage to psychiatrists only. The Court rejected the argument that her injury—unreimbursed psychologists' fees—did not reflect the anticompetitive effect of the limitation. It held, instead, that the injury she suffered "was inextricably intertwined with the injury the conspirators sought to inflict" on the market. 457 U.S. at 483–84, 102 S.Ct. at 2550–51. In addition, the harm she suffered was a "necessary step in effecting the ends of the alleged illegal conspiracy." *Id.* at 479, 102 S.Ct. at 2548.

Like the defendants in *McCready,* the CBOT allegedly intended to impact both the

cash and futures markets to bring down prices in both markets in order to protect *both* clients who needed to offset short positions *and* clients who had failed to hedge against large soybean purchasing needs. Pl. Complaint at 15–17. Lower courts have read *McCready* to require that a plaintiff's injury be necessary or integral to effecting the alleged anticompetitive scheme. *See Sullivan,* 25 F.3d at 48–50 (restraining trade in sale of football team stock was not the "very means" by which alleged market in sports facilities was restrained); *Bodie–Rickett,* 957 F.2d at 291–92 (plaintiff not "fulcrum" by which defendants attempted to injure competitors in other markets). But, taking the farmers' allegations as true, injury to the farmers was necessary to accomplish the CBOT's allegedly anticompetitive scheme. The cash and futures markets for soybeans are so closely related that a directive issued toward one promised to invariably impact the other. And the farmers have suggested that an impact in both the cash and futures markets was necessary to effect the competitive scheme.

CBOT raises numerous other issues that it claims render dismissal of the complaint proper. It suggests that damages are speculative and involve complex apportionment, and that participants in the futures market were more directly injured. Each of these factors may be considered in determining whether a plaintiff has antitrust standing. *See Lovett,* 975 F.2d at 520. But no single factor is conclusive. *Bodie–Rickett,* 957 F.2d at 290. Here, we disagree with CBOT's characterization of these matters as factors that cut in favor of dismissal. Futures market participants were not more directly injured than cash market participants because, as we have indicated, both markets were affected by the allegedly anticompetitive conduct. Damages will be neither speculative nor difficult to apportion. Both parties can offer proof concerning the extent to which a decline in the cash market price of soybeans (an objectively verifiable matter) was or was not attributable to the liquidation of positions prompted by the CBOT's Resolution. A damages calculation for a market manipulation scheme, though it may require expert testimony, is hardly beyond the ken of the federal courts.

The district court improperly dismissed the farmers' complaint for lack of antitrust standing.

### III.

The district court's conclusions under Article III were correct. Because the farmers seek money damages for a violation of § 4 of the Clayton Act, the AAM has no standing to sue as an association in their behalf. The farmers who refrained from selling soybeans also lack standing in light of the multifaceted reasons for which an individual may decide not to purchase or sell. The dismissal of these claims was therefore appropriate. The district court should not have dismissed the claims of the farmers who sold soybeans at allegedly depressed prices, however. Taking the allegations of their complaint as true—as we must when faced with a motion to dismiss—they claim an injury which, if proved, is direct enough to withstand challenge under both Article III and the standing requirements of the antitrust laws.

AFFIRMED in part, REVERSED in part and REMANDED.