# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-1196

CAROLYN G. KOCHERT,

*Plaintiff-Appellant,*

*v.*

GREATER LAFAYETTE HEALTH SERVICES, INC., et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Indiana, Lafayette Division.
No. 01 C 27—**Allen Sharp**, *Judge.*

ARGUED FEBRUARY 13, 2006—DECIDED SEPTEMBER 12, 2006

Before KANNE, EVANS, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* In this appeal, Carolyn Kochert challenges the district court's grant of summary judgment for the defendants on Kochert's claims alleging violations of Sections 1 and 2 of the Sherman Antitrust Act. Mindful of the Supreme Court's admonition that the purpose of federal antitrust law "is not to protect businesses from the working of the market; it is to protect the public from the failure of the market," *see Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993), we conclude that Kochert does not have antitrust standing, and so we affirm the judgment of the district court.

## I.  BACKGROUND

Carolyn Kochert, M.D., began practicing anesthesiology in Lafayette, Indiana in 1985. From 1985 to 1994, Kochert practiced at both of the hospitals in Lafayette, Home Hospital and St. Elizabeth's Medical Center ("SEMC"). In 1994, Home Hospital and defendant Anesthesia Associates entered into a contract granting Anesthesia Associates, an anesthesiology practice group, exclusive rights to provide anesthesia services at Home Hospital. It is undisputed that exclusive services arrangements between anesthesiology practice groups and hospitals are commonplace in this industry and do not inherently raise anticompetitive concerns. After being offered the contract for anesthesia services at Home Hospital, Anesthesia Associates offered anesthesiologists with privileges at Home Hospital subcontracts to provide anesthesia services at Home Hospital. Kochert received a subcontract, which was eventually extended to 1998. Although Kochert's Home Hospital subcontract was not renewed in 1998, she continued to provide anesthesia services at SEMC.

In 1998, Home Hospital and SEMC merged to form defendant Greater Lafayette Health Services ("GLHS"), which administered both hospitals. Soon thereafter, Lafayette Anesthesiologists, a practice group of which Kochert was a member, obtained an exclusive three-year anesthesiology contract at SEMC, in which Kochert participated. When this contract expired in 2001, GLHS did not renew its ties with Lafayette Anesthesiologists and instead contracted with Anesthesia Associates to provide exclusive anesthesia services at SEMC. Anesthesia Associates's contract to provide exclusive anesthesia services at both Home Hospital and SEMC has been extended several times and the current extension terminates October 14, 2006.

Kochert claims that Lafayette Anesthesiologists was the only group "within an hour of Lafayette" that could pro-

vide a competitive check on Anesthesia Associates. Due to Anesthesia Associates's exclusive contracts, Kochert alleges that she has been unable to practice anesthesiology at Home Hospital since March 1998 and at SEMC since 2001. Kochert claims that consumer welfare decreased because of the exclusive contracts with Anesthesia Associates. For instance, she states that before Home Hospital awarded the exclusive contract to Anesthesia Associates in 1994, there were no reported problems with anesthesiologists leaving operating rooms or otherwise failing to monitor patients undergoing surgery, while such problems became commonplace after the grant of the exclusive contract to Anesthesia Associates in 1994. She also claims that the exclusive contracts increased anesthesia services prices and increased delayed surgeries due to the unavailability of Anesthesia Associates anesthesiologists. Defendants counter that short absences of anesthesiologists during surgical procedures is commonplace, and they cite a 1997 report by the American Society of Anesthesiologists that determined the "quality of anesthesia care at Home Hospital to be good."

Allegedly because of the limitations on her anesthesiology practice, Kochert began considering a practice in pain management in 1998. She received board certification in pain management in 1999, and later that year opened a pain management practice (Advanced Pain Management). By August 1, 2000, Kochert was practicing pain management full time. Kochert claims that she did not enter that field voluntarily, but rather was forced into pain management practice due to the operation of the exclusive Anesthesia Associates contracts. She claims that she made written requests to exercise her privileges in anesthesiology at GLHS in 2002 and 2003. Kochert continues to practice pain management at Home Hospital and SEMC today.

In September 2001, Kochert brought this antitrust suit against GLHS, Anesthesia Associates, and John Walling

(GLHS's CEO). She alleged that she suffered antitrust injury as a direct consequence of the defendants' actions excluding competition from the market and that the defendants exercised monopoly power in the market. To support her claims, Kochert attempted to introduce the testimony of several experts, including Dr. Bruce Seaman, an economist. Seaman opined that the relevant product market was "anesthesia services,"[1] and offered three versions of the relevant geographic market,[2] the broadest of which included Tippecanoe County and seven contiguous counties.

Defendants GLHS and Anesthesia Associates filed *Daubert*[3] motions to exclude Seaman's testimony, arguing that Seaman had (1) incorrectly defined the relevant product market, (2) used incorrect methodology in defining the relevant geographic market and unreliable definitions, and (3) failed to do a dynamic analysis. After extensive hearings and oral arguments regarding the *Daubert* issue, the district court admitted Seaman's expert testimony, noting that the fact that the evidence passed muster under a *Daubert* relevance and reliability analysis did "not ensure or decide whether such evidence is ultimately persuasive." The question of the evidence's persuasiveness, the district court stated, would be decided "either during summary judgment or at trial."

---

[1]  According to Kochert's brief, the relevant product is "anesthesia services in support of inpatient surgical and obstetrical services, both requiring a hospital stay of greater than 23 hours." (Pl. Brief at 15.) References to "anesthesia services" throughout this opinion are generally limited to this definition.

[2]  The three versions offered were (1) Tippecanoe County, (2) Tippecanoe, Montgomery, Clinton and White Counties, and (3) Tippecanoe and its seven contiguous counties.

[3]  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

A month later, the district court granted summary judgment to the defendants on all counts and claims. The district court found that Kochert had no antitrust standing and had not met her burden of proving an antitrust violation. The court ruled that Kochert could not withstand summary judgment on the antitrust violation in part because she could not show that the defendants' alleged practices had produced any anti-competitive effects in the relevant geographic market.[4] Specifically, the district court held that Seaman's eight-county geographic market was too narrow for two reasons: the results of his analysis for this area did not yield results sufficient to accept his definition of the market, and Seaman's analysis ignored commercial realities of the area.

The district court also concluded that: (1) Kochert failed to demonstrate that the exclusive contract between GLHS and Anesthesia Associates constituted an unlawful tying arrangement; (2) the contract between Anesthesia Associates and GLHS did not constitute an illegal "group boycott" of Kochert; (3) no reasonable trier of fact could conclude that the defendants caused actual harm to competition, or that GLHS is able to restrain trade due to its market power; (4) the defendants lacked the requisite specific intent necessary for a conspiracy to monopolize in violation of the Sherman Act; (5) *res judicata* barred Kochert's Count V group boycott claim; (6) Kochert could not succeed on her "essential facility" claim because alternative facilities are available; and (7) Kochert's Indiana state antitrust claims could not survive summary judgment.

Kochert now appeals the grant of summary judgment.

---

[4] *Kochert v. Greater Lafayette Health Servs.*, 372 F. Supp. 2d 509, 516 (N.D. Ind. 2004).

## II. ANALYSIS

We review the district court's grant of summary judgment *de novo*. *In re Copper Antitrust Litigation*, 436 F.3d 782, 788 (7th Cir. 2006). All facts must be construed in the light most favorable to Kochert, the non-moving party. *Id.* The district court's grant of summary judgment was proper only if there was "no genuine issue as to any material fact and . . . the moving party [was] entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## A. Article III Standing

The defendants argue, for the first time on appeal, that Kochert lacks standing under Article III of the United States Constitution. Of course, defendants are not precluded from raising this claim because such a challenge to the court's jurisdiction may not be waived. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230-31 (1990). Indeed, we "are under an independent obligation to examine [our] own jurisdiction, and standing 'is perhaps the most important of the jurisdictional doctrines.'" *Id.* (quoting *Allen v. Wright*, 468 U.S. 737, 750, (1984)) (brackets omitted). Generally, all that is required to demonstrate Article III standing is "injury in fact plus redressability." *See U.S. Gypsum Co. v. Indiana Gas Co., Inc.*, 350 F.3d 623, 627 (7th Cir. 2003); *Sanner v. Bd. of Trade of City of Chicago*, 62 F.3d 918, 922 (7th Cir. 1995) (stating with more specificity that "(1) the party must personally have suffered an actual or threatened injury caused by the defendant's allegedly illegal conduct, (2) the injury must be fairly traceable to the defendant's challenged conduct, and (3) the injury must be one that is likely to be redressed through a favorable decision") (quoting *Valley Forge Christian Coll. v. Americans United for Separation of Church and State*, 454 U.S. 464, 472 (1982)).

The defendants argue that Kochert cannot demonstrate that her injury is "fairly traceable" to their challenged conduct, and cite our *Sanner* decision, where we concluded that "soybean farmers who refrained from selling soybeans due to the depressed price of the cash market lack[ed] standing under Article III" to pursue their antitrust claims. *See Sanner*, 62 F.3d at 923. We reasoned in *Sanner* that these farmers could not establish the traceability prong of the Article III standing inquiry because the decision not to sell could have been motivated by many factors and it would be impossible to weigh the impact of the alleged violation on this omission. *See id.* at 923. Defendants analogize this to Kochert's situation by arguing that she is incapable of demonstrating that her decision to exit the anesthesia services market was the exclusive product of their anticompetitive actions. They point to the timing of her exit from the anesthesia services market and portions of her deposition testimony suggesting that other considerations may have played a role.

We do not agree that Kochert lacks Article III standing. As discussed *infra*, the defendants have raised a significant challenge to Kochert's antitrust standing. But the Article III standing inquiry does not require Kochert to prove as much. *See, e.g., Florida Seed Co., Inc. v. Monsanto Co.,* 105 F.3d 1372, 1374 (11th Cir. 1997) ("Antitrust standing requires more than the 'injury in fact' and the 'case or controversy' required by Article III of the Constitution."). A question of material fact remains as to whether Kochert suffered an injury as a result of defendants' actions since Kochert can construct a reasonable causality chain linking her injury to defendants' actions. What remains in question is whether any of defendants' actions were anticompetitive and, if so, whether the *anticompetitive actions* led to Kochert's injury. We think it more appropriate to assess

these questions in the context of antitrust standing and antitrust injury.

## B. Antitrust Standing and Injury

The Supreme Court has observed that "[a]ntitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise . . . . as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms." *United States v. Topco Associates, Inc.*, 405 U.S. 596, 610 (1972). Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. The purpose of the Act is "to assure customers the benefits of price competition." *See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, et al.*, 459 U.S. 519, 538 (1983) (discussing the legislative history). The Supreme Court has stated that the "central interest" of the Act is "protecting the economic freedom of participants in the relevant market." *Id.* We have similarly observed that "[t]he principal purpose of the antitrust laws is to prevent overcharges to consumers." *Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n, Inc.*, 814 F.2d 358, 368 (7th Cir. 1987).

Given the intent of our antitrust laws, courts have developed the doctrine of "antitrust standing" and the subsidiary doctrine of "antitrust injury" in order to assure efficient use of the resources of the courts towards achieving these goals. *See generally* William H. Page, *The Scope of Liability for Antitrust Violations*, 37 STAN. L. REV. 1445, 1446-63 (1985); *see also U.S. Gypsum Co. v. Indiana Gas Co., Inc.*, 350 F.3d 623, 627 (7th Cir. 2003) (questioning the wisdom of the "antitrust standing" nomenclature in light of

the potential for confusion with Article III standing). Under Section 4 of the Clayton Act, "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent." 15 U.S.C. § 15(a). The Supreme Court has cautioned that this seemingly broad language must be interpreted more narrowly in light of Congressional intent as revealed by the legislative history. *See Associated Gen. Contractors*, 459 U.S. at 529-35. Thus, "not all persons who have suffered an injury flowing from [an] antitrust violation have standing to sue under § 4." *In re Industrial Gas Antitrust Litigation*, 681 F.2d 514, 516 (7th Cir. 1982). Under our precedent, "only those parties who can most efficiently vindicate the purposes of the antitrust laws have antitrust standing to maintain a private action under § 4." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 597-98 (7th Cir. 1995) (quoting *In re Industrial Gas*, 681 F.2d at 516). Kochert must demonstrate that she meets the requirements of both antitrust injury and antitrust standing to succeed on the merits of her tying, boycott, and conspiracy claims under the Sherman Act. *See Greater Rockford Energy and Technology Corp. v. Shell Oil Co.,* 998 F.2d 391, 404 (7th Cir. 1993) ("a showing of both antitrust injury and antitrust standing are necessary to proceed under § 4").

### 1. Antitrust Injury

The threshold question for our inquiry is whether Kochert has suffered an antitrust injury. Kochert must demonstrate that her "claimed injuries are 'of the type the antitrust laws were intended to prevent' and 'reflect the anticompetitive effect of either the violation or of anticompetitive acts made possible by the violation.'" *Tri-Gen Inc. v. Int'l Union of Operating Eng'rs, Local 150*, 433 F.3d 1024, 1031 (7th Cir. 2006) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). Kochert's cognizable injuries are variations on the theme of lost income in her anesthesia practice. We must determine whether these alleged injuries are the result of defendants' allegedly anticompetitive acts.

But first, we must assess what anticompetitive behavior is at stake here. The parties dispute the starting point of defendants' anticompetitive acts. The most obvious point in time is 2001, when GLHS formulated its exclusive contract with Anesthesia Associates. Before this point, Lafayette Anesthesiologists had an exclusive contract with SEMC while Anesthesia Associates had an exclusive contract at Home Hospital, and, therefore, the Lafayette market was serviced by two competing anesthesia services groups. Only after GLHS contracted exclusively with Anesthesia Associates in 2001 were the doctors of Lafayette Anesthesiologists (and hence Kochert) completely foreclosed from practicing anesthesia services at either of the two Lafayette Hospitals. This time line creates an obvious problem for Kochert because the record makes clear that she was no longer a practicing anesthesiologist at this point.[5]

Recognizing this problem, Kochert argues that the real starting point of defendants' anticompetitive acts is 1998,

---

[5] Kochert has maintained anesthesia privileges at SEMC, but the record is clear that she was practicing pain management full-time by mid-2000.

when Anesthesia Associates declined to renew its subcontract with her. Kochert's theory is that this event set off an anticompetitive chain reaction which culminated in her complete exclusion from the Lafayette anesthesia services market in 2001. Kochert does not contend that the pre-2001 activity, viewed independently, constituted anticompetitive activity under the Sherman Act. Indeed, her expert, Seaman, testified at his deposition that the events in Kochert's chain prior to 2001 did not independently raise "any major anticompetitive concern." The only independent event Seaman identified as having anticompetitive effects was GLHS's 2001 discontinuation of the exclusive contract between SEMC and Lafayette Anesthesiologists. Seaman, however, also advanced Kochert's chain reaction theory of anticompetitive effects.

We agree with the district court that Kochert's chain reaction theory must be rejected. Kochert has offered no precedential support for the proposition that a court should look backward from the point of the actual anticompetitive activity in search of the genesis of the acts that eventually allowed the anticompetitive behavior to occur. Such an examination would have no logical starting point in this case. Kochert argues for 1998, which coincides with the point at which her injuries accrued, but one could just as easily argue that the starting point of the chain reaction was 1994, when Home Hospital first awarded an exclusive contract to Anesthesia Associates. But the 1994 contracting is not logically the first domino because it clearly was not part of an anticompetitive scheme. The same logic applies to the 1998 denial of renewal of Kochert's subcontract—either this act constituted a part of an anticompetitive scheme or it did not. If it did not, it is not the starting point for our examination of defendants' allegedly anticompetitive behavior.

Kochert asserts that events in an antitrust case must be viewed "not in a vacuum or in isolation, but as a con-

tinuum," and cites several cases in support of this contention, including our decision in *In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651, 655-56 (7th Cir. 2002). We do not quibble with the proposition that courts should not be myopic in their assessment of potential violations of the antitrust laws, but Kochert's reliance on this concept is misplaced in the context of the current inquiry. If she could demonstrate that the events of 1998 actually were elements of a broader anticompetitive scheme, we would be remiss if we failed to consider them in the antitrust injury assessment. But she cannot. There is no evidence that any of the events of 1998, including Anesthesia Associates's decision to deny Kochert a subcontract, were part of an anticompetitive scheme that culminated with GLHS's decision to contract exclusively with Anesthesia Associates. They were simply staffing decisions made solely by parties without market control. We have stated explicitly that "the staffing decision at a single hospital [is] not a violation of section 1 of the Sherman Act." *See BCB Anesthesia Care Ltd. v. Passavant Memorial Area Hospital Ass'n*, 36 F.3d 664, 668 (7th Cir. 1994) (collecting cases).

Furthermore, the cases Kochert cites in support of her argument do not address the issue of antitrust injury as we examine it here. *In re High Fructose* discusses the need for holistic examination of a defendant's acts in the context of a court's assessment of price-fixing arrangements. *See In re High Fructose*, 295 F.3d at 655 ("The second trap to be avoided in evaluating evidence of an antitrust conspiracy for purposes of ruling on the defendants' motion for summary judgment is to suppose that if no single item of evidence presented by the plaintiff points unequivocally to conspiracy, the evidence as a whole cannot defeat summary judgment"). The case does not address either antitrust standing or antitrust injury. The other cases cited by Kochert are similarly inapposite. *See Continental Ore Co.*

*v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("(T)he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.") (quoting *American Tobacco v. United States*, 147 F.2d 93, 106 (6th Cir. 1945)); *Aspen Highlands v. Aspen Skiing Co.*, 738 F.2d 1509, 1522 n.18 (10th Cir. 1984) (concluding that the six parts of the plaintiff's evidence of monopolization "should be viewed as a whole."); *City of Mishawaka, et al. v. American Elec. Power Co.*, 616 F.2d 976, 986 (7th Cir. 1980) (concluding that the various acts of a monopoly in a "price squeezing" scheme can not be looked at in a vacuum for the purposes of determining whether there is evidence of a Sherman Act violation). Moreover, none of the plaintiffs in the cases Kochert cites attempted to introduce evidence of activity postdating their participation in the market as proof of antitrust injury. Kochert has not introduced evidence supporting the conclusion that anything other than GLHS's 2001 elimination of the exclusive contract between SEMC and Lafayette Anesthesiologists should be considered as the starting point for our antitrust injury analysis.

This conclusion brings into focus the central question in assessing Kochert's alleged antitrust injury: did GLHS's 2001 elimination of the exclusive contract between SEMC and Lafayette Anesthesiologists cause Kochert's injuries? Put another way, was this act "the cause-in-fact of the injury," or can it be said that "'but for' the violation, the injury would not have occurred"? *See Greater Rockford Energy and Technology Corp. v. Shell Oil Co.*, 998 F.2d 391, 395 (7th Cir. 1993). Since Kochert was practicing pain management full-time as of August 2000, the answer to all of these questions is "no." GLHS's anticompetitive behavior in 2001 did not injure Kochert's anesthesiology practice because it was nonexistent by this point. Kochert therefore fails to establish one necessary prong of the two-pronged test that the Supreme Court described in *Bruns-*

*wick Corp.*; she cannot demonstrate that her injuries "flow[ ] from that which makes defendants' acts unlawful." *Brunswick Corp.*, 429 U.S. at 489. She has not demonstrated antitrust injury.

### 2. Antitrust Standing

Even if Kochert could establish antitrust injury, she would still fail to establish antitrust standing because she is not the party "who can most efficiently vindicate the purposes of the antitrust laws" in this case. *See Serfecz*, 67 F.3d at 598. The Supreme Court has identified six factors that courts should weigh in making this assessment:

> (1) [t]he causal connection between the alleged anti-trust violation and the harm to the plaintiff; (2) [i]mproper motive; (3) [w]hether the injury was of a type that Congress sought to redress with the antitrust laws; (4) [t]he directness between the injury and the market restraint; (5) [t]he speculative nature of the damages; (6) [t]he risk of duplicate recoveries or complex damages apportionment.

*Sanner*, 62 F.3d at 927 (describing factors articulated in *Associated General Contractors*, 459 U.S. at 537-46).

The fourth factor weighs particularly heavily in this case. In discussing the directness inquiry, the Supreme Court stated that "[t]he existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party . . . to perform the office of a private attorney general." *Associated Gen. Contractors*, 459 U.S. at 542.

As was the case in *Serfecz*, Lafayette's anesthesia "consumers could maintain an action if defendants' actions stifled competition allowing defendants to engage in monopoly pricing in the retail [ ] market." *See Serfecz*, 67

F.3d at 598. These consumers, or perhaps one of the entities that is also directly affected by rises in anesthesia services prices, such as an insurer, would be a more efficient claimant. The Court's concern with opening the antitrust litigation floodgates also suggests that groups of doctors, such as the excluded Lafayette Anesthesiologists group, might serve as better plaintiffs than individual doctors like Kochert. Denying Kochert "a remedy on the basis of its allegations in this case is not likely to leave a significant antitrust violation undetected or unremedied." *See Associated Gen. Contractors*, 459 U.S. at 542. If Anesthesia Associates and GLHS are truly manipulating the anesthesia services market in order to raise prices and drive down quality of care, these effects will not be missed by patient-consumers or insurers.

Two other factors outlined in *Associated General Contractors* that weigh against a finding of antitrust standing are addressed in the context of our antitrust injury analysis. Though Kochert is arguably a direct competitor, the causal connection between her injury and the antitrust violation is tenuous at best. Kochert has also failed to produce evidence of improper motive. She has not offered any arguments with regard to the other factors sufficient to tip the scales away from our ultimate conclusion. Kochert does not have antitrust standing.

Finally, though it is ultimately unnecessary, we note that the record is bereft of any credible evidence of the type of anticompetitive effects alleged by Kochert. Kochert's economics expert testified at his deposition that "there is no particular evidence on nominal rates that would suggest an exercise in market power." With no evidence that prices, in the normal sense, have been affected by anticompetitive activity, Kochert (and her expert) relied exclusively on her evidence of diminished quality of care as proof of anticompetitive effect, in and of itself, and as proof of higher "quality adjusted" costs. But no reasonable jury,

examining Kochert's evidence of diminished quality, could find it credible as proof of such diminution. Kochert has not introduced any evidence that would allow a jury to compare the quality of care prior to defendants' anticompetitive acts with the quality of care after these acts. She has not introduced any statistical analysis focusing on measurable indices of quality, such as the number of patient complaints or mortality rates. Instead, Kochert offers expert testimony and physician affidavits which rely almost exclusively on anecdotes, such as one story about an anesthesiologist leaving an operating room momentarily to eat a sandwich, to prove diminished quality. We have serious doubts about the usefulness of Kochert's evidence. But we will not resolve this issue because it is clear that Kochert does not have antitrust standing.

## III.  CONCLUSION

The judgment of the district court is AFFIRMED.

No. 05-1196                                                17

A true Copy:

        Teste:

                        _____
                        *Clerk of the United States Court of*
                        *Appeals for the Seventh Circuit*